# DAVE *vs.* THE STATE.

1. If a slave throws off the authority of his master, puts himself in a hostile attitude towards him, resists his dominion and control by physical force, evincing by his acts, while in a personal conflict with the master, a design to make that resistance effectual in escaping from his dominion and authority, the master has the right to employ such means, and so much force to any extent, as will be effectual to subdue him. But if the slave is not resisting the master by physical force, or by hostile acts, and is simply in a state of disobedience, without personal violence towards the master, then the latter can only administer such punishment as is appropriate to the case, without endangering life or limb.

2. The slave undoubtedly has the natural right of self-preservation or self-defence; but in order to avail himself of this for the justification of his acts, he must not himself be a wrong-doer. If, in the perpetration of a wrong, he does an act which he might justify if he were in the right, the law will no more protect him on the ground of natural right, than it will any other wrong-doer.

3. *It seems*, that malice is not a necessary ingredient of the offence denounced by the second section of the fifteenth chapter of the Penal Code (Clay's Digest 472 § 2,) against a slave "who shall commit an assault with intent to kill any white person."

4. When a slave, in a personal conflict with his master, resists his authority by physical force, and in that resistance kills his master, he cannot reduce the crime from murder to manslaughter, by showing that in the commencement of the resistance he had no design to take life.

5. When the charge of the court asserts a correct proposition of law in favor of the defendant, he cannot complain on error that it did not go far enough, and announce to the jury the full extent of his rights. It was his duty, to have called for a fuller charge upon the point.

6. If a slave stabs his master with intention to kill, while resisting his authority in a personal collision with him, it is no justification of the act that the slave was impressed at the time with a reasonable sense of imminent danger to his own life.

7. The action of the Circuit Court in permitting additional evidence to go to the jury, to prove the venue as laid, after the argument has been closed and the jury instructed, is purely discretionary, and not revisable on error.

8. To render a witness competent to testify to the general character of the accused, it is not necessary that he should know what a majority of his neighbors said or thought of him, nor that he should have heard some one say what a majority of them said or thought of him; the only test of his comtency is, whether he knows the general character of the accused among his neighbors or those acquainted with him.

9. Injury will be presumed from error, unless the record itself rebuts the presumption, and shows affirmatively that no injury could have resulted from the ruling of the court to the party excepting.

ERROR to the Circuit Court of Perry.

Tried before the Hon. A. B. MOORE.

This was an INDICTMENT against a slave named Dave, for an assault upon a free white person with intent to kill. On the trial below the defendant was convicted, and the sentence of the law was passed upon him. At the trial a bill of exceptions was allowed, and the matters in it assigned for error are substantially the following:

The State introduced a witness, one John B. Cunningham, and proved by him the following facts, to wit: "That John Cunningham, witness' father, hired from Mrs. Sarah Underwood, the defendant, Dave, for the present year, and that witness was attending to the business of his father, and had the boy Dave under his control; that on the evening of the 24th January last, witness, about one half hour by sun, told the defendant Dave, and two other boys that were at work with him, that it was time for them to go and attend to their business—the defendant's business being to feed and curry the horses and mules—and then rode home; that on the morning of the 26th of January, he went to where these boys were at work getting timber for shingles, and found Dave there; that he then had a negro whip in his hand, and walked up and caught the boy Dave with his left hand by the collar or neck handkerchief, and while thus holding him, asked him why he had disobeyed his orders, and had not fed the mules and horses on Saturday evening before; that Dave replied, that his master, Franklin Morgan, had sent word to him that one of his dogs had run mad and that he wished him, Dave, to help him kill him; that the witness then told Dave, that he, Dave, had to obey him, and not his master, Franklin, or any body else, and that he intended to whip him, and ordered the boy Dave to drop his pantaloons; that the boy Dave replied, that he had done nothing to be whipped for, and that he would not do it; that witness then ordered the other two boys, slaves, working on a log near by, who were likewise under his control, to come to his assistance, and to take hold of the boy Dave; that they started; that about that time witness struck Dave over the head with the butt of the whip, that he then held in his right hand, and the boy Dave drew out his pocket knife, and the witness supposed that it was open when he drew it out of his pocket, and told the other boys that if they took hold of him he

would cut them or kill them, and that he cut the left hand of the witness while he was holding him by the collar on the inside of the hand; that the other boys refused to take hold of the boy Dave, and said that he would kill them; that the witness then told the boy Step to take the axe and knock him in the head, and that he would stand between him and all danger; that Dave cut the witness on the breast, on the left arm, in two places on the shoulder, in the groin and the right hand; that when the boy cut his right hand, Dave got away from the witness, and left. Witness stated, that the boy cut him in about twenty-six places, but many of the cuts were very slight; that he was very feeble, and started for home, and by the assistance of one of the boys he rode home; that on the way they washed his face with water to enable him to get home; that he was confined to his room, or about the house, for some six weeks."

On his cross-examination he stated, that "he thought he received the cut on the shoulder, in the breast, in the groin, and the two cuts on the left arm, before he gave the order to Step to knock the defendant in the head; but that he could not tell which cut was first given, nor when he was cut in either place; but that his best recollection was, that he felt his left arm give way before he gave the order to Step to knock the defendant in the head with the axe; that when he felt his left arm give way, he took hold of the defendant by the collar with the right hand; that Step ran, and seized the axe, when told to knock Dave in the head, and started towards Dave, but that Dave cut his right hand and got away before Step got to him; that the difficulty lasted about a minute and a half."

Doctor Browder proved the character of the wounds: "That the wounds on the breast and near the groin were dangerous; that some of the others might have been, but were not dangerous." It was also proved, that the knife was taken from the boot of Dave, after he had been examined for the knife on the day after the difficulty took place, and that he said, when examined for the knife, that he had thrown it away.

The defendant introduced a witness to prove his general character as a peaceable and obedient boy; "and the court

explained to the witness, that general character was, what a majority of an individual's neighbors said or thought of him; and in order to enable a witness to speak of general character, he must either know what a majority of the individual's neighbors said or thought of him, or must have heard some one say what a majority thought or said of the individual, as to his being peaceable and obedient; and that a witness might swear that he knew the general character of another person, without being able to recollect at the time he testified the name of a single person he had heard speak of it; and if the witness had not such knowledge, he could not speak of the defendant's character." To this ruling the defendant excepted.

The defendant then introduced Mrs. Sarah Underwood, and proved by her that she had known the defendant from his infancy; that the defendant was raised by her father, and that she knew him well and had owned him since 1845; and then asked the witness whether or not Dave was a peaceable and obedient boy; to which question the solicitor objected, and the court sustained the objection; to which defendant excepted.

Upon this state of facts the court charged the jury as follows:

"That if they believed from the evidence that J. B. Cunningham had charge of defendant as overseer, and gave defendant orders to do certain things, and he refused to obey the orders so given, Cunningham had the right to chastise him; and if defendant resisted, he had the right to use so much force as was necessary to make defendant submit, short of taking his life, or limb; and if they believed from the evidence that the defendant stabbed him with the intent to kill, he would be guilty; that it was not necessary for them to believe from the evidence, as insisted by defendant's counsel, that defendant at the commencement of the difficulty intended to kill, in order to find him guilty; but if the jury believed from the evidence that defendant put himself in the wrong in the first instance by resisting the overseer, and continued to resist him, and drew his knife and cut the overseer, although they might believe that defendant had no intention to kill up to the time the order was given to another slave

to knock him in the head with the axe, and he was thereby induced to believe that his life was in danger, or that he was in danger of receiving great bodily harm, and he then stabbed Cunningham with intention to kill, he would be guilty. If, however, the jury believe that Cunningham directed another slave, during the difficulty, to knock defendant in the head with an axe, and that defendant was thereby induced to believe his own life was in danger, or that he was in danger of receiving great bodily harm, and he became so much alarmed that his reason was dethroned, and then inflicted the wounds, without any particular intention, or merely with the intention of cutting himself loose from the overseer to escape, then he would not be guilty; to which charges the defendant excepted."

The defendant, by his counsel, requested the court to charge the jury:

1. That, in order to make out the offence under the statute against the defendant, it was the duty of the State to show evidence that the defendant had a fixed intention to kill Cunningham at the time the difficulty commenced, and that unless the testimony satisfied the jury that, at the time the difficulty commenced between Cunningham and the defendant, that the defendant then intended to kill Cunningham, he is not guilty; which charge the court refused to give, and the defendant excepted.

2. That under the indictment in this case the State must show by the testimony, that there was a felonious intent to kill Cunningham at the time the difficulty commenced, and that if such felonious intent is not shown, the defendant is not guilty; which charge the court refused, and the defendant excepted.

3. That if they believed from the testimony, that at the time J. B. Cunningham ordered the boy Step to take the axe and knock the defendant in the head, and that he would stand between him and all danger, there was no intention on the part of the defendant to kill Cunningham up to that time, and that the defendant was impressed with a reasonable belief by such order to knock him in the head, that his own life was in imminent danger, and inflicted the wounds in the manner stated by the witness, Cunningham, while thus im-

pressed with a sense of such danger, then he is not guilty. The court declined to give this charge without qualification, and the defendant excepted. The court charged the jury, that he would give the above charge with this qualification, that if defendant was resisting the overseer, although they might believe he was impressed with a reasonable sense of imminent danger to his life, if while thus impressed, he intended to kill Cunningham, he would be guilty; and to this charge, with the qualification, the defendant excepted.

4. The defendant requested the court to charge the jury, that the State must show that the crime was committed in Perry county, and that unless the testimony showed the place at which the difficulty took place was in Perry county, they could not find the defendant guilty. The court responded to this charge by saying, he would give the charge, but if the proof had not been made, he would then permit it to be made, notwithstanding the testimony had been closed, the counsel had argued the cause, and the court had charged the jury; and the court then permitted the proof to be made, the defendant objecting; to which the defendant excepted.

The errors assigned embrace all rulings of the court above set out, to which exceptions were taken.

JOHN, for plaintiff in error:

1. The indictment alleges that the intent was felonious. This being a description of the particular kind of intent, or of an ingredient in the offence charged, must be proved. Therefore the charge of the court on this point, and the refusal to charge as requested in this particular, was erroneous. 1 Green. Ev. 76; Felix v. The State, 18 A. R. 720.

2. This indictment is founded on a statute of this State. (Clay's Dig. 472 § 2.) This statute increases the punishment; consequently this is a statutory offence; the conviction is not sustained by the common law; if sustained at all, it must be by the statute alone—by the plain letter of the statute, and not by presumption or implication. An assault with an intent to kill a white person is the offence. In this offence are four ingredients, viz: 1st. the assault; 2d. the intent; 3d. to kill; 4. a white person. If any one of these essential ingredients be wanting, a conviction under the statute would

be erroneous. If there be no assault, there is no violation of the statute. If there be an assault with any other intent than the intent to kill, as for instance, an assault with intent to mayhem, the offence is not made out. Or if there be an assault with an intent to kill any one but a white person, as for instance, a black person or negro, the offence is not made out, and a conviction cannot be sustained. Nelson, a slave, v. The State, 6 A. R. 394; The State v. Marshall, 14 A. R. 411; Roscoe's Crim. Ev. 298.

3. The assault must be with the particular intent, and not with any other. The punishment is not imposed by the statute for resisting the master or overseer with weapons or otherwise, or for anything but the assault with an intent to kill a white person. Therefore, if the prisoner assaulted Cunningham with the intent of getting away from him, or with the intent of defending himself from great and impending danger to his life or person, or with any other intent except the intent expressed by the statute, or if the assault was with no particular intent, he would not be guilty under the statute. Although the assault or intent were illegal, the intent and assault must accompany each other. Rex v. Duffin & Marshall, 1 Eng. Crown Cases, 364, 365; Territory v. Mather, 2 Martin's La. R. 48; Respublica v. Reiker, 3 Yeate's Penn. R. 282.

4. If these positions be correct, then the charge of the court excepted to, as shown in the bill of exceptions, is erroneous for several reasons. The charge was calculated to mislead the jury, and to exclude from their consideration several important inquiries. It was an incorrect exposition of the law applicable to the construction of the statute. The substance and effect of this charge is, that the prisoner was guilty under the statute as charged, unless his reason was dethroned by the order to knock him in the head with the axe, and while his reason was thus dethroned, he inflicted the wounds with no particular intent, or with the intention of cutting himself loose from the overseer to escape. This cannot be a proper construction of this statute. If his reason was dethroned, he was not a responsible agent, and therefore not guilty, no matter what the intent. But suppose his reason not dethroned, and the wounds were inflicted with no

other intention than that of escaping, and not with intent to kill, he certainly would not be guilty within the terms of the statute; but the charge declares him guilty unless his reason was dethroned. The dethroning his reason was the only thing that would take the case out of the statute, or authorize the jury to acquit under this charge. If the prisoner had the use of his reason, he was guilty, irrespective of the intent. The State v. Bill Jefferson, a slave, 3 Harrington R. 571; Regina v. Cruse et Ux. 8 Carr. and Payne 541; 34 Eng. C. L. R. 522.

5. Upon the authority of the cases of The State v. Bill Jefferson, 3 Harrington, and Cruse & Wife, in 8 Carr. and Payne, the second charge asked by the prisoner and refused by the court was correct; for unless the jury believed from the testimony that the prisoner had in his mind a positive intention to kill when the assault was made, he was not guilty, and the intention must be proved, and could not be presumed from the act. These cases are upon the construction of statutes similar to the one under consideration, and are entitled to great consideration. They show that the charge given was incorrect, as well as that the charges asked were correct and should have been given.

6. A slave has a right by the law of nature to defend his life, and this right cannot be superseded by any law of society. If, then, the prisoner inflicted these wounds under a reasonable belief of impending necessity to save his own life, he cannot be guilty under the statute. The statute cannot take away this natural right; consequently any construction that deprives the prisoner of this right must be incorrect. Therefore, the third charge asked for should have been given without qualification. Wharton's Crim. Law 254; Oliver v. The State, 17 A. R. 587, 598; The State v. Abram, a slave, 10 A. R. 928.

7. The circumstances which create this belief, and from which this necessity arises, must be left to the jury to determine, and cannot be determined upon by the court, as in this case. If the charge precludes the jury from drawing the conclusions from the facts, the charge is erroneous. The charge in this case conflicts directly with this position, and assumes that Cunningham was right in the order to the boy

Dave v. The State.

Step to knock the defendant in the head. This was a question for the jury.

8. The qualification given to the third charge asked by the prisoner was erroneous in itself, and being given in connection with the charge asked, rendered that charge erroneous when given; it was error to refuse the charge as requested, and it was error to give it as qualified. A master by virtue of that relation has no right to take the life of the slave. If he attempt to take the life of the slave, the slave may defend his life. How, then, can the slave be capitally punished for defending his life? Does the mere act of resisting, although wrong, deprive him of the right of self-defence? Does he forfeit his life by resisting? This is the effect of the qualification; and not only that, but this qualification puts his guilt on the question of whether he resisted or not; if he resisted he was wrong, and therefore guilty as charged. This must be an incorrect exposition of the law, and invades the province of the jury as well as misleads them. It is conviction by presumption from a fact which the statute does not attempt to punish.

9. The court erred in refusing the charge as to venue when asked; it was requested at the proper time, and should have been given; what was subsequently done cannot cure this error. The practice is exceedingly dangerous, and should not be allowed.

10. The court erred in explaining to the witness what constituted general character, and by that definition cut off the prisoner from important and legal testimony, which he had a right to introduce for the purpose of generating a doubt. If this definition of what constitutes general character be correct, the proper question to be asked a witness is: do you know what a majority of a person's immediate neighbors think of him in regard to (truth and veracity) his being a peaceable and obedient servant—or have you heard any one say what a majority of his neighbors thought of him? This rule cuts off nine-tenths of the community from the benefit of general character; general character is common report or reputation. 2 Phil. on Ev. Cow. & Hill's Notes 767, Note 531, p. 293; Hadjo, use, &c., v. Gooden, 13 A. R. 718, 721–2; Kinnel v. Kinnel, 3 Sergt. & Rawl 336.

11. The court erred in excluding the evidence offered by Mrs. S. Underwood, as to the prisoner's being a peaceable and obedient servant. The sources and extent of her knowledge of his character were sworn to, and are sufficient to authorize her to testify. They are sufficient to bring her closely within the rule, and is the precise kind of testimony introduced by the defendant in the case of Felix v. The State, and passed upon as proper testimony in a case of this kind. Felix v. The State, 18 A. R. 722, 725–6.

I. W. GARROTT, for the State:

1. The objection that the record does not show that defendant was served with a copy of the indictment and a list of the jurors two entire days before his trial, cannot prevail. (The State v. Williams, 3 Stewart 454.) Every intendment must be made in favor of the regularity of the proceedings of a court of general jurisdiction. In the case of The State v. McLendon, 1 Stewart, relied on by defendant's counsel, objection was taken in the court below.

2. The court did not err in its explanation to the witness, as to what it was necessary for him to know before he could speak of defendant's general character; or rather the court erred on the side of the defendant, because the explanation goes much farther in his favor than the law allows. The court said, that the witness could prove character if he knew himself what a "majority" of his neighbors said or thought of them; whereas, the law would only let the witness speak of character who knew what the people of the neighborhood "generally" said of him. "People in general," is certainly more comprehensive than a majority merely. 1 Ph. Ev. 212; 2 ib. Cowen and Hill's Notes 767; Kinnel v. Kinnel, 3 S. & R. 336; Wike v. Lighter, 11 S. & R. 198–9; Adams v. Hannon, 3 Miss. 222; Miller v. Brown, 3 ib. 127–31.

3. But whether the court erred in this explanation as to character or not, cannot avail the defendant anything before this court; because the defendant does not show that he was, or could by any possibility have been, in any way injured by it; for it does not appear that one particle of evidence was excluded, or one single witness prevented from testifying, in consequence of the court's having given said explanation. If there was error, it was error without injury.

Dave v. The State.

4. The court did not err in refusing to permit Mrs. Underwood to answer the question asked, as to defendant's being a peaceable and obedient boy—1. Because the question is leading; the words whether or not cannot relieve the question from this objection. (People v. Mather, 4 Wendell 229.) 2. Because the answer sought was a mere opinion or conclusion of the witness; 3. Because the object was to prove a fact which can only be established by proof of general character; proof of general conduct is illegal. Roscoe's Cr. Ev. 97; 1 Gr. Ev. § 55, last clause; 11 S. & R. *supra.*

5. The charges and refusals to charge are correct. The ruling of the court is predicated on the idea that the slave was wrong in resisting his overseer, and being thus wrong at the outset, and the cause of the whole difficulty that followed, he is responsible for the consequences. This was correct. · 1. The word "felonious," used in the indictment, is mere surplusage. (The State v. Beasley, 18 A. R. 535.) The State, therefore, could not be held to prove the intent to be felonious. 1 Gr. Ev. § 51; Nancy v. The State, 6 A. R. 483.

2. The provocation was sought by defendant, and he cannot justify. Roscoe's Cr. Ev. 724. If death had ensued, it would have been, in any possible aspect of the case, manslaughter at the very least, and this shows that the court was correct.

3. Unconditional submission is the duty of the slave. Wharton's Crim. Law 238, Note Y. 241; The State v. Will, 1 Dev. & Bat. 121; The State v. Jarratt, 1 Iredell 76; The State v. Cæsar 9 Iredell 391.

GIBBONS, J.—In the relation of master and slave, the master is entitled to the absolute dominion and control over the slave. The slave owes absolute and unconditional submission to the master. The master has the right to chastise and punish the slave in order to enforce his obedience, and to compel him to the performance of his duties. If the slave throws off the authority of the master, puts himself in a hostile attitude towards him, resists his dominion and control by physical force, evincing by his acts, while in a personal conflict with the master, a design to make that resistance effectual in escaping from his dominion and authority, the master

has the right to employ such means, and so much force, to any extent, as will be effectual to subdue him. But if the slave is not resisting the master by physical force, or by hostile acts, but is simply in a state of disobedience, without personal violence towards the master, then the latter can only administer such punishment as is appropriate to the case, without endangering life or limb.

The slave, in common with all human beings, undoubtedly has certain natural rights, and among these, is that of self-protection or self-defence; but in order to avail himself of these natural rights, for the justification of his acts, he must not himself be a wrong-doer. If, in the perpetration of a wrong, he does an act which he might justify if he was in the right, the law will no more protect him on the ground of natural right than it will any other wrong-doer.

The charge of the court below as given to the jury, when tested by these principles, we think contains no error. The first proposition which it asserts is, that if the defendant had neglected to perform his duty, and the overseer was proceeding to chastise him for his disobedience, and the defendant thereupon resisted him, the latter had the right to use so much force as was necessary to overcome such resistance; and if the defendant in this conflict between the overseer and him, drew his knife and stabbed the overseer with the intent to kill him, then he was guilty. This proposition as thus stated is undoubtedly correct. The court in its charge limited the right of the overseer in the employment of force, to overcome the resistance of the defendant, to the point "short of taking life or limb." The charge would have been correct even without that qualification. For we have already aboved stated that, if the slave is in open hostile rebellion against the master, and is resisting his legal authority by physical force, the master has the right to employ so much force as shall be sufficient to overcome such resistance.

The second proposition asserted by the charge is, that it was not necessary that the defendant should have engaged in this conflict with the fixed design of killing the overseer, in order to render him guilty; but that if, after the conflict commenced, and the defendant was resisting the overseer, the defendant drew his knife and stabbed the overseer with

the intention of killing him, he was guilty. This proposition also, we think correct. The converse of it goes upon the hypothesis, that the offence for which the defendant was tried, necessarily contemplates malice. We do not think this the proper construction of the statute creating the offence. Besides, the proposition announced by the court, we think entirely correct, even if malice had been an ingredient of the offence. The slave who is resisting the master's authority by physical force, in a personal collision with him, is a wrong-doer; and if in that resistance he kills the master, he cannot reduce the crime from murder to manslaughter, by showing the fact, that in the commencement of the resistance he had no design to take life. The fact that he subsequently took life designedly would make the homicide malicious. The State v. Will, 1 Dev. & Battle 121.

The next proposition asserted by the charge is, that if the defendant, when the overseer ordered another negro to knock him in the head with an axe, was so much alarmed that his reason was dethroned, and he then made the cuts without any intention at all, or with the intention of cutting himself loose, he was not guilty. We see no error in this proposition of which the defendant can complain. It may be conceded, that the intention to cut himself loose was confined in the charge to the state of mind when the reason was dethroned; still there would be no error in the charge of which the defendant could complain, because there is nothing contained in it against him. It is entirely for him, as far as it goes. The objection is, that it does not go far enough, and announce to the jury the full extent of the defendant's rights. But this objection we cannot here consider. It was the privilege of the defendant to have called for a fuller charge upon this point, and if he neglected to do so we cannot aid him. The sole question for us is, whether the charge contains error against the defendant? We are clear that it does not.

What we have already said in reference to the second proposition announced by the court to the jury, necessarily disposes of the first and second charges prayed by the defendant. The propositions contained in these charges are simply the converse of that there discussed; and, that being correct, these were correctly refused.

The third charge asked by the defendant seems to be based upon the idea that, although the defendant was resisting the authority of the overseer by actual force, still, if he believed or had reason to believe, that his life was in danger, or that some bodily harm was about to happen to him, he could, by virtue of his natural rights, justify the stabbing, although it was done with the intent to kill. This is in direct conflict with what we have above stated, in the preliminary part of this opinion; and we deem it only necessary to add here, that the charge was properly refused. The qualification of this charge as given to the jury, was correct.

In reference to the action of the court in permitting additional testimony to be given to the jury, after the cause had been argued and the jury charged, we have but to say, that we consider it a matter entirely within the discretion of the court, and not revisable on error.

It appears by the bill of exceptions, that on the trial below, the defendant introduced a witness to prove his general character as a peaceable and obedient boy. "The court explained to the witness, that general character was what a majority of an individual's immediate neighbors said or thought of him; and in order to enable a witness to speak of general character, he must either know what a majority thought or said of an individual, or he must have heard some one say what a majority thought or said of him, as to his being peaceable and obedient; and that a witness might swear that he knew the general character of another person, without being able to recollect at the time he testified, the name of a single person he had heard speak of it; and if the witness had not such knowledge, he could not speak of the defendant's character."

"The regular mode of examining into the general reputation," says Mr. Greenleaf, in laying down the rule for impeaching a witness, "is, to inquire of the witness whether he knows the general reputation of the person in question, among his neighbors, and what that reputation is." 1 Green. Ev. § 461. The rule as laid down by Mr. Phillips, in cases where the character of the prisoner is in issue, is as follows: "The inquiry must also be as to general character; for it is the general character alone which can afford any test of gen-

eral conduct, or raise a presumption, that a person who had maintained a fair reputation down to a certain period, would not then begin to act a dishonest, unworthy part. Proof of particular transactions in which the defendant may have been concerned, is not admissible as evidence of his general good character. What, then, says the same author, is evidence of general character? The best medium of proof is, by showing how the person stands in general estimation; proof that he is reputed to be honest, is evidence of his character for honesty, and the species of evidence most properly resorted to in such inquiries." 1 Phil. Ev. 491. The court below went on to define what general character was, and asserted that it was what a majority of the individual's immediate neighbors said or thought of him; and from this postulate, laid down a rule for the competency of the witness, to wit: That the witness must know what a majority of the person's neighbors said or thought of him; or he must have heard some person say what a majority of the man's neighbors said or thought of him. This rule, as laid down by the court, might, as we conceive, exclude witnesses perfectly competent to testify. It may so happen, that a man has a reputation well established, either good or bad, and yet, a majority of his neighbors may never have spoken upon the subject, or expressed their thoughts in any manner whatever. We do not understand it to be essential to the establishment of a reputation, good or bad, that it should be preceded by the expression of an opinion by a majority of the person's neighbors. This rule, carried out in practical life, might cut off many a man from proving a character, who would otherwise be enabled to establish it. Many a witness, put upon the stand, might be willing to say, that he knew the general character of another, and would be willing to swear; but when his competency was tested by the rule laid down by the court, he might not be able to say that he knew what a majority of the man's neighbors said or thought of him. There may not have been a majority who have expressed an opinion to the witness; nor may he be able to say, with positive knowledge, what a majority think; nor may he have heard any one else say what a majority said or thought, and yet himself be competent to swear what his general reputa

tion is. A person's position in a community may be so obscure that very few of his neighbors know any thing of him; his general character may be very circumscribed. To hold that he could not prove his general character, except by witnesses, who could swear as to what the majority of his neighbors said or thought of him, would be, to deprive him of the benefit of this species of testimony. We think the rule laid down by the books the safer, and we are not disposed to allow a departure from it. The question should be, whether the witness knows the general character of the accused, as a peaceable and obedient boy among his neighbors, or those acquainted with him; and the answer to this question must be the test of the competency of the witness.

It is true, the rule laid down by the court might, by one interpretation of it, and under certain circumstances, operate in favor of the accused. The word "majority," is usually understood in a less comprehensive sense than the word "general;" and, in a case of doubtful reputation, a bare majority might be sufficient to make the reputation good, when, by the regular rule, it would be equivocal. But this only shows the impolicy of departing from the well-settled rules of law, that are uniform in their operation. We have already shown that it might operate against the defendant.

It is insisted, however, that it does not appear from the record, that any injury was done the defendant by the rule laid down by the court. It is true, the record does not show any direct injury to the defendant; but it is not enough that no injury is shown by the record to have resulted to the party excepting to the ruling of the court. The doctrine recognized by this court is, that we will presume injury from error, unless the record itself rebuts the presumption, and shows affirmatively that no injury could have resulted from the ruling of the court to the party excepting. *Ex parte* Keenan, 21 Ala. 558; Frierson v. Frierson, ib. 549.

Whether any witness was excluded or not, by this ruling of the court, the record does not show; and the rule itself as laid down being wrong, we must here hold it error.

The witness, Mrs. Underwood, was correctly excluded. By reference to the above cited authorities, it will be seen, that when a witness is called to speak of the reputation or

character of any one, the preliminary question is, whether he knows the general character or not. If he answers this question in the affirmative, he is competent; if in the nega-tive, he is incompetent. Mrs. Underwood had not rendered herself competent to testify by her answer to this question. It is true, she stated that she had known the defendant from his infancy; but this may well be, and yet she may not know his general character. When character is in issue, individual opinions are, in general, not competent to be given to the jury. An exception to this rule sometimes obtains, when testimony of character is given, with a view of impeaching a witness; but in other cases, it is only knowledge of general character—the character which the man bears generally among the persons with whom he associates, and by whom he is known; in other words, his general neighborhood repu-tation—that can be given in evidence.

For the error above noted, the judgment of the court be low is reversed, and the cause remanded.