STATE OF MISSOURI, Respondent, *v.* JAMES S. ROTHSCHILD, Appellant.

### March 19, 1878.

1. The order of introduction of evidence is not a matter for exception; and it is not error to let in evidence that a witness has been tampered with, with the understanding that if the prosecution fail to connect the prisoner therewith, the testimony shall be taken from the jury. Upon failure to so connect the accused, the testimony should be taken from the jury by an instruction; but it is defendant's duty to ask such instruction; and if he neglects to do so, and the court fails to give it, this is not ground for reversal. If the defendant desires to exclude such evidence, he should require the prosecution to state for what purpose it is offered, and whether he expects to connect the accused with it.

2. It is proper to ask a witness who has testified to the bad character for truth and veracity of another witness, whether he would believe the latter under oath. But where the witness attacked has been fully impeached, and two other witnesses have been allowed to state that they would not believe him under oath, the refusal to allow the question to be asked a third witness is not ground for reversal.

3. Where the guilt of the accused is clearly made out by proper evidence, so as to leave no room for a reasonable doubt, the case will not be reversed because of immaterial error, which could not have prejudiced the accused.

APPEAL from St. Louis Criminal Court.

*Affirmed.*

J. G. LODGE, for appellant: The admission of testimony that a witness in the case had been tampered with, where there is a failure to connect the accused therewith, is error, and ground for reversal. — *The State* v. *Mix*, 15 Mo. 153; *The State* v. *Wolf*, 15 Mo. 168; *The State* v. *Marshall*, 36 Mo. 400; *The State* v. *Daubert*, 42 Mo. 240. It is error to refuse to allow a witness, who has testified to the bad character of another for truth and veracity, to say whether from such reputation he would believe the latter upon oath. — 1 Greenl. on Ev., sec. 461; *Hamilton* v. *The People*, 20 Mich. 173; *Hillis* v. *Wilie*, 26 Ohio St. 574.

L. B. BEACH, Circuit Attorney, for respondent.

BAKEWELL, J., delivered the opinion of the court.

Defendant was convicted of having committed grand larceny, by stealing $20 in money of the United States, and certain United States bonds of the value of $1,200, on Nov. 7, 1875. From this conviction he appeals to this court.

It appears from the testimony that, at the date named, defendant was barkeeper in a house of prostitution kept by his mother. The prosecuting witness, whilst drunk, dropped the bonds in the bar-room of the house in question, where they were picked up by defendant. The testimony of the prosecuting witness is to the effect that he had been drinking for two days; that he entered the bar-room in question, under the influence of liquor, some time before midnight, with $3,200 in United States bonds and about $30 in greenbacks in a pocket-book, which he carried in the breast-pocket of his coat. He had also some money in his trousers pocket, for current expenses. He passed the night drinking in Rothschild's bar-room. He remembered almost nothing of what passed; and, as to the greater portion of the time he was there, his mind is a perfect blank. He left the house about six in the morning; and soon afterwards, found that his pocket-book, with $2,000 in an inner compartment, was safe, but that four bonds, amounting to $1,200, were gone. The witness continued to drink, and did not entirely get over his debauch for two or three days. He suspected defendant; but, as he had been on the same evening in another house of the same character, he was not sure where he had lost the money. He was ashamed of the occurrence, and disposed to keep quiet about it. He went to the bar-room again, and had some conversation with defendant, but did not ask about the bonds, and defendant said nothing to him about the matter. His object in this visit was to regain his property; but he thought it policy not to ask about it directly. In his direct

examination, he says that this interview with defendant was within a very few days after the loss. In his cross-examination, he says he is certain it was within a month.

One Samuels, a man of degraded character, who states that since the alleged larceny he has passed a term of six months in the work-house, as a pimp and associate of thieves, was indicted with Rothschild; but the case was *nol. pros'd* as to him, and he was used as a witness by the State. He swears that he was present when the prosecuting witness dropped his pocket-book, without knowing it, whilst falling on the floor, drunk. The defendant picked up the pocket-book, and placed it behind the bar; that the defendant, the prosecuting witness, and himself then went together to the neighboring market-house, where they separated; and that defendant afterwards told him that he had returned the pocket-book to the man who lost it. The witness saw some bonds in. the pocket-book when it dropped.

The clerk of the Lindell Hotel testified that on the morning of the occurrence the accused deposited at the hotel, for safe-keeping, an envelope which he said contained $1,200 in bonds, which had been dropped by a drunken man; and that the defendant called for the package the next day. On cross-examination, he said that he fully believed that the package was called for the next day, but that it was possible that he might be mistaken as to the time, and it might be that it was not called for for a week or two. No record or memorandum of such deposits is kept.

The negro man who sweeps out the bar-room testified, for defendant, that the pocket-book dropped, and was replaced in the breast-pocket of the prosecuting witness by Rothschild; that after the man had gone out, Rothschild saw the bonds lying on the ground, and picked them up, and stated what they were, and said that he would leave them at the Lindell Hotel, and went out to do so. Samuels was

not present at the time, having gone out a few minutes after the drunken man left.

Rothschild testified, in his own behalf, that he did not know the prosecuting witness by name, but had seen him before the night that he came into the saloon drunk; that he found the bonds on the floor, and thought they belonged to the prosecuting witness; that he ran out into the street, hoping to catch him, but he was out of sight; that he at once deposited them at the Lindell Hotel, and then consulted his lawyer, who told him that he had done well, and that the bonds would probably be called for; that he expected the loser would advertise, and examined the papers from day to day for some notice of the bonds; that he left the bonds at the Lindell Hotel till December, — three or four weeks; that he then withdrew them, and placed them in a wardrobe in a sleeping-room occupied by himself and a gambler named Howe, who also had a key to the wardrobe; they lay there on a shelf, exposed to the view of any one opening the wardrobe, until December 18, when Howe disappeared, and the bonds at the same time; that he made great efforts to find Howe, writing to detectives in other cities, and going to Cincinnati for that purpose himself, but that Howe could not be found; he did not notify the police of his loss, fearing it might get him into trouble. When asked why he feared trouble, he said, at first, that he had denied having the bonds, to some member of the police force; but afterwards said that he had not made such denial till after his indictment and the loss of the bonds. On the day he found the bonds, he mentioned the fact to other persons besides the hotel clerk and his lawyer, and showed the receipt for the envelope given by the hotel clerk to the boy who cleaned his sleeping-room, telling him of the occurrence. This boy was examined, and testified that he had access to the wardrobe, and saw the bonds on the shelf in the envelope, from about December

till the time Howe left. Rothschild further swore that the prosecuting witness never asked him for the bonds; that he did not know his name; that if he had asked for them he would have given them to him; and that he was pecuniarily responsible, and quite able to make good the loss after the bonds disappeared from his possession, but had never been called upon to do so.

On the trial, the witness Samuels, in his direct examination, testified, without objection on the part of the defence, that he left the State during the pendency of the prosecution, with a detective officer named Eagan; that one Looney, an officer of police, furnished the money; and that though he did not know from whom the money came, he " expected " it came from Rothschild. The circuit attorney then asked the witness whether he knew, of his own knowledge, that the persons who paid him money and tampered with him came from defendant. The question was objected to as assuming facts not proved, and as incompetent and irrelevant; and the objection was overruled. The court then examined the witness, and elicited from him that officers Looney, Reinstaedler, and Eagan asked him to go away; that Eagan said it was all right with the chief, and nothing would be done; that Looney paid him $25; that they did not say why they wanted him to go; that the witness went to Indianapolis with Eagan, in obedience to the wishes of these officers; that Reinstaedler was present when the money was paid. In answer to questions from the circuit attorney, the witness then said that one of the Rothschilds, he did not know which, telegraphed to a young fellow that was with witness to come back, — it would be all right. An objection was then interposed again, and the court said: " I am asking for this testimony  This case seems to me to have been born in sin and conceived in iniquity. That is the reason I asked these questions. If the officers of this court and of this city are to get before the grand jury evidence, without preferring preliminary

charges in the preliminary courts, and then buying off witnesses without any preliminary examination, I will see that they are brought to justice, and that too, speedily, without any preliminary charges. If the defendant is not connected with it, it can be withdrawn from the jury by instruction."

To all of this testimony defendant objected at the time. Each one of these officers was put on the stand by the defence, and contradicted the witness in all these particulars. No attempt was made to connect the defendant with this alleged bribery and removal of the witness. And no instruction was asked, and none was given, directing the jury to disregard this evidence. The admission of this testimony, as well as the neglect to take it from the jury, are assigned for error.

Where incompetent evidence, calculated to prejudice the defendant, is improperly introduced on the trial of a criminal case, it is held that the impropriety is not cured by withdrawing the evidence from the jury by an instruction. The poison is administered, and perhaps the antidote may not have complete effect. The impression may be too deeply fixed to be obliterated. *The State* v. *Mix*, 15 Mo. 153 ; *Id*. 168 ; 35 Mo. 533 ; 36 Mo. 400 ; 42 Mo. 242.

But the removal of proofs tending to show that an offence has been committed, or the bribing of witnesses, is conduct from which an inference against the accused may be properly drawn. It is always competent to show that this has been done, or attempted, by the prisoner. And, of course, it cannot be shown that this was done by the prisoner if it be not shown that it was not done at all. The order of the introduction of evidence is not a matter of exception ; and it is not error in the court to let in evidence that a witness has been tampered with, with the understanding that, if the prosecution fail to connect the prisoner with the attempt to corrupt or remove the witness, the testimony shall be taken from the jury. Whether such evidence is admissible or not, cannot be certainly determined until all the facts are

elicited ; and if, on the examination of witnesses, evidence which afterwards proves to be incompetent is admitted, and afterwards excluded by proper instructions, this is no ground of error. *Fitzgerald* v. *The State*, 14 Mo. 413. In the case before us, the court did orally declare that unless the evidence should be connected with the prisoner it must not be considered by the jury, though no such instruction was asked, and none to that effect given, at the close of the case.

Even if the form of the first question put by the circuit attorney was objectionable, as assuming what had yet to be proved, it is manifest from the answers of the witness that the result of the examination must have been the same had the questions been put in the most legitimate shape. The circuit attorney did not state that he expected to connect the defendant with the alleged attempt to tamper with the witness ; but this evidence became incompetent, not because its object, which was manifest, was not expressly stated, but because, in fact, the circuit attorney failed to connect defendant with it. At the time, it was not incompetent, because it was manifest, from what had been already testified, that the intention of the prosecution must be to show its relevancy by further evidence. That the witness had left the State at the instigation of the detectives, with money furnished by them, and, as he supposed, through Rothschild, had already been elicited from the witness, without any objection, before the court took the witness in hand for the purpose of getting at the details of the alleged offence against justice, in the interest of the public. That these details were elicited rather served the defendant, by making the contradiction of this witness more explicit and overwhelming. Such facts as these may always be shown in a criminal case, where the prosecuting attorney undertakes to make them relevant ; and the discernment of the jury must be trusted so far, in case it should turn out to be immaterial. *Haigh* v. *Belcher*, 7 Car. & P. 399. The trial judge pushed

the inquiry, obviously supposing, and even stating at the time, that it had been entered upon with the expectation of connecting the prisoner with it.   The proper course for counsel for defendant to pursue was to require the State to say whether or not it expected to connect the prisoner with this tampering with the witness.   If the State's attorney had answered "No," the testimony must have been excluded, and all further questions as to the matter from the court would probably have been avoided.   Had the attorney for the State said "Yes," the court would have been bound to admit the testimony, and then to take it from the jury by an appropriate instruction.   If the court failed to do this voluntarily, it was. the duty of counsel for the prisoner to pray such an instruction; and had it been refused, this would have been error for which the cause must have been reversed.   But where evidence competent for some purpose, or which for any reason it was not error to admit at the time, is not taken from the jury, through mere oversight on the part of the judge, at the close of a long trial and protracted examination, as the evidence was admitted without error, the constant practice has been to refuse to reverse merely for neglect to give an instruction which was not asked.   *The State* v. *Phillips*, 24 Mo. 484.

It is further objected that the trial court refused to allow a witness who had testified to the bad character of Samuels for truth and veracity to be asked whether he would believe him under oath.   We think the question was competent. In England, the rule is unchallenged that the proper question is, "From your knowledge of his general character, would you believe him on his oath?"   Roscoe's Cr. Ev. 101.   It is said by Greenleaf (Ev., sec. 461), that in the American courts the propriety of this rule has been questioned, and that perhaps the weight of authority is now against permitting the witness to testify as to his own opinion.   It is true that the propriety of the rule has been questioned, and even denied, by a very learned judge, Shep-

ley, of Maine, recently deceased, and the authority of *Phillips* v. *Kingsfield*, 19 Me. 375, has been followed in some instances; but an examination of the cases cited in *Hamilton* v. *The People*, 29 Mich. 187, where the question is carefully examined, shows that the American decisions do not shake the English doctrine, but uphold it. The question having been put to the impeaching witness whether he knows the character of the person assailed, for truth and veracity, the next question properly is whether, from that reputation, he would believe him under oath. In the case at bar, however, the error was not material, because the assailed witness was shown, out of his own mouth, to be a man of very bad character, and was proved to have the reputation of a liar and a thief; and two of the three witnesses who were examined on this subject were permitted to say that they would not believe him upon his oath. An additional line could have added no perceptible darkness to the picture. The testimony of the witness, so far as it was not corroborated, was manifestly worthless.

The case was given to the jury on instructions of which appellant cannot complain. Exception was taken to the refusal of one instruction asked by him; but, so far as it is a correct declaration of law, this instruction was given by the court in another shape. The jury were told that they could not convict unless satisfied from the evidence that the intention to steal was formed in the mind at the time the money and bonds were taken; and that, if a felonious intent was not formed by the accused until after he had taken them, they must acquit. There was evidence to support the verdict, and we see no error in the record which could prejudice the accused. The whole testimony in the case has been carefully read, and we think the guilt of the accused was clearly made out by proper evidence, so as to leave no room for reasonable doubt. Such being the case, it is our duty to affirm the judgment. *Dave* v. *The State,*

22 Ala. 23; *Fralich* v. *The People*, 65 Barb. 68; 1 Zab. 347; 14 Ga. 55; 11 Conn. 415; *The State* v. *Holme*, 54 Mo. 153; *The State* v. *Jennings*, 18 Mo. 435.

The judgment of the court below is affirmed. All the judges concur.