No. 5.—ARMISTEAD T. STOKES, plaintiff in error, *vs.* THE STATE OF GEORGIA, defendant in error.

[1.] There may be cases of voluntary manslaughter, in which there was no assault made upon the person killing, by the person killed.

[2.] "The regular mode of examining into general character, is to inquire of the witnesses whether they have the means of knowing the former witness' general character, and whether, from such knowledge, they would believe him on his oath."

Indictment for murder, in Wilkes Superior Court. Tried before Judge ANDREWS, September Term, 1854.

Armistead T. Stokes was indicted for the murder of James Henly. On the trial, the following evidence was submitted to the Jury:

WILLIAM C. DENT, sworn: Was present when difficulty happened in this county on 12th February, 1853; was at Stokes' to help raise a house; just before dinner a dispute arose between Mr. Curry and prisoner, when we were raising house; no fight, but an offer, when Mr. Henly interfered and prevented it. Prisoner then went to his house. Witness and Henly also went to house to dinner. When we got there, found prisoner lying on the bed. Henly and witness sat down to dinner when several words occurred between prisoner and Henly; about what, witness does not recollect. Henly told prisoner if he wanted a thrashing and would go to the road he, Henly, would give it to him. Prisoner and Henly then

started from the house—Henly before and prisoner following him. Witness followed after; when some 8 or 10 steps from the road, prisoner struck Henly. Henly was a few steps in advance of prisoner when they left the house; remained about the same distance apart until the blow was struck; heard no words between them. Witness was some 4 or 5 steps behind them. Prisoner walked behind all the way from the house to where blow was struck; saw the blow struck; prisoner was behind and rather to the right. Henly fell when the blow was given, and was dead as soon as witness reached him; blow was over the right breast, and struck over right shoulder of Henly. Witness did not see the knife when blow was struck; saw a knife that evening said to be the one with which the blow was struck. After Henly fell, prisoner went back to house. Saw Henly make no offer to strike prisoner, while on the way to the road; the road was some 130 or 140 yards from house, and outside of the inclosure where the stabbing took place. Witness was invited by prisoner's boy to house-raising.

Cross-examined: Witness does not recollect what the quarrel between prisoner and Henly in the house was about; witness had no recollection of having words with prisoner in the house; witness had been drinking before dinner; the quarrel occurred soon after we set down to the table ; has no recollection of any words that passed between prisoner and Henly, until invitation to go to road. Mrs. Stokes was waiting on table; did not hear her say any thing during quarrel; does not know that quarrel was about Mrs. Stokes. Witness did not know that prisoner and Henly were really angry until they started to the road. There was a gate on the way to the road—road from Mallorysville to Petersburg, about 4 or 5 steps from gate; open space between gate and the road which could be travelled; heard no words when blow was struck. Witness was some 4 or 5 steps behind Stokes when blow was struck, and Stokes followed Henly from house two or three steps behind. Saw blow struck, but saw no knife; both walking on when blow was given. Henly offered no resistance when

blow was struck. After deceased fell, witness went to field, sent a boy over to Mr. Curry's and went, himself, to Andrews. Before they left the house, Henly told Stokes if he (Stokes) wanted a thrashing and would go to the road he, Henly, would give it to him; recollects not a word or syllable said in quarrel by Stokes or Henly before the challenge to go to road; recollects nothing said by Mrs. Stokes. Witness did not state, on former examination, that Mrs. Stokes put in during the quarrel.

Direct, resumed: Witness heard prisoner and Henly running on while at dinner, but did not know or believe they were quarrelling; was common with prisoner to be running on. Gate was about one hundred yards form house; conversation was between all of us, at the new house, about the wagon left by Stokes, when he went off with Judge Barkesdale.

SIMPSON CURRY sworn: Witness was employed by prisoner as overseer in the year 1853. Prisoner proposed to build a house for witness. Prisoner told witness, three times, to ask James Henly and George House to assist in raising the house; on the day of house-raising a difficulty occurred between witness and prisoner, about dividing expenses of liquor for the hands. Stokes had a knife and witness had a hand-stick. When witness was in the act of striking prisoner, Henly, the deceased, interposed and caught witness' arm. Stokes left quick after the difficulty. A short time after Stokes left, the horn blowed and Dent and deceased left for the house; did not see deceased again until after his death. Mr. Dent sent a boy after him. Witness saw no knife where the body lay; did not remain there but a few minutes. Witness then went to Mr. Willis'. Next saw Mr. Stokes in the yard, while I was out to the road where Henly was dead; some hundred yards from where Henly laid to where Stokes was standing. Witness told deceased's children while passing through the yard, that if Stokes had whipped Henly he could not whip him, witness. By the time witness got to the road, Stokes came out into the yard and said something to witness; witness does not recollect what, and witness hallooed to him, "you have killed this

man." Stokes replied, "I can lay you by the side of him;" and asked witness if he should do it. Saw Mr. Dent after I came back from Mr. Willis'; Dent was not drunk; had not drunk much where witness was, before dinner. When witness told Stokes he, Stokes, had killed Henly, Stokes gave no reason; the wound on the body of Henly was between 2d and 3d rib, on right side; saw no sign of a scuffle where body of Henly lay; ground was such that witness would have seen signs of scuffle if there had been any; the body was lying on the right arm, with one leg lain across the thigh of the other; blood had flown out, and in one place. Witness and Mr. Andrews stopped Stokes in the woods, some 200 yards from house; does not recollect hearing prisoner say any thing about the killing when he was stopped; when he went back to the house prisoner said, I have killed the best friend I have and shall hang for it. Prisoner said he had done it in self-defence. Witness was present at examination of wound; was not close enough to see much.

Cross-examined: When witness went through yard, prisoner was on the bed, and witness thought, asleep. Witness went from the dead man to Mr. Willis', about a quarter of a mile off; found no one there, and came right back to body and found Mr. Andrews, Mr. Willis, Mr. Dent, Geo. House and Ashmore at the body. Witness knew of no cause of difficulty between prisoner and deceased; was at Henly's house on the night of the 24th December, 3 o'clock. Henly told witness he, Henly, had been to Stokes' and had just got home. Witness knew that Mrs. Stokes stayed all night at Henly's once before the killing. Deceased told witness, on the night of the 24th, that he had been to Stokes' to meet witness, who was returning from Augusta. Stokes was gone to Tennessee at the time. Henly was not absent when Mrs. Stokes stayed all night at his house, but left next morning for Augusta. Mrs. Stokes staid at Henly's one day and two nights, and went over the river after she left Henly's, with her brother-in-law; staid some three or four days until prisoner went for her; deceased was a widower and lived about one mile from

Stokes'.   Deceased had eight children, and the neighborhood was densely settled.

Direct, resumed: Prisoner and deceased had been friendly previous to killing, and prisoner had frequently invited deceased to his house.   It was the day before the house-raising that prisoner told witness to invite Henly over.   The house-raising was about half a mile from Stokes' house.   Prisoner was drinking, about half and half drunk, on morning of the house-raising; have known prisoner forty years; was always a peaceable man and averse to difficulties; never had heard of any jealousy between prisoner and deceased.   Henly was a larger man than prisoner or witness; Henly was sober on the day of the killing, so far as witness knows.   Found the body lying on the right arm and one leg across the thigh of the other; deceased had on no coat; did not see any coat on the ground.   The body was some 40 steps beyond and outside of the gate.

WILLIAM ANDREWS, sworn: Witness has been acquainted with prisoner since prisoner was ten years old; was also acquainted with deceased; deceased had about 8 children, 3 daughters pretty well grown; saw prisoner on 12th Feb'y, first between 3 and 4 o'clock, P M; was sent for by Mr. Willis; saw Stokes in his own field, going off.   Witness, when opposite the house, saw prisoner making towards the river towards Mr. Cade's mill.   Witness hallooed to prisoner and told him to go back and stay back; prisoner turned round as though going back, walked a few steps and replied, you are no officer; I will walk where I please.   Prisoner left the road and went round through the wood; saw nothing of him for some time; witness went up the hill and prisoner stepped out from the bushes, about 10 or 15 steps in front of witness; prisoner walked up towards witness, within a few steps, with his right hand in his pocket.   Witness told prisoner to take his hand out of his pocket, and witness levelled his gun at legs of prisoner; after the order, prisoner kept advancing and raising his foot.   Witness told prisoner if he, prisoner, put his foot to the ground he, witness, should shoot.   Witness

asked, what possessed you to kill Henly? Prisoner replied, I did kill him, and expect to be hung for it; and if I could kill two or three others I would be perfectly willing to be hung. When witness thought he would have to shoot, he called for Curry to witness it. Witness had been sitting on the root of a tree and prisoner in the road; he, prisoner, got up and walked off. Witness told him, when they got to the forks of the road, he might go 30 or 40 steps, but no further. Prisoner went about 30 steps and stopped, with his back to witness and Curry, then walked back towards us, and I ordered him to keep on the other side of road—if he came close I would lay him out as straight as he had laid out that poor man. Prisoner hung down his head and asked witness to go to the house with him. Witness refused and Curry went; after prisoner had been in house some three quarters of an hour he came out and walked up towards the body of Henly. Witness told him to hold on—he had gone as near as he ought. Prisoner stopped and observed to the crowd, that Henly was a connection and a brother mason, and he would not have killed him for the world, but he had to do it in self-defence. Prisoner walked about a little and said he would give himself up; witness told him not to go to the house, but to set down. Prisoner said Henly had struck him with a stick; there was no stick near the corpse a short time afterwards. Prisoner observed, that Henly had shot at him. Witness asked the prisoner where the pistol was. Prisoner replied, he, Henly, has it about him. Witness then searched deceased and found a common old single bladed knife in his pocket; the knife was shut. On Monday after, prisoner said he was struck with a stick by Henly on the back of the neck; did not ask him on the day when he was struck, as witness saw no stick. Witness asked prisoner to lend him the knife he struck Henly with; witness looked at it and examined it; knife exhibited in Court; witness says it is the same one handed him by Stokes, or out of same paper. When Dent came to me he was about as a man who had taken one drink of liquor or so; should not have known, from his appearance, that he had taken

liquor, if witness had not known it was used at the house-rais-
ing.

Cross-examined: Mr. Dent went for witness; was as a man
who had taken a drink or so; witness took his gun and went
round the fence. Prisoner was in the road, in his own field,
when I saw him, about 100 yards from the house; witness
went round the fence losing sight of prisoner, and Stokes
came out of the woods towards where I was standing in the
road. Prisoner seemed to be going down the hollow; witness
told him not to come nearer; that he, witness, was going to
meet him; the first time witness saw prisoner, after he got
round the fence, he was coming out of the bushes and ap-
proaching him. Witness first saw the knife in the hands of
prisoner when he gave himself up; the knife was asked for
and given up; nothing else found on the person of prisoner.
At the conversation around the body, witness thinks John
Andrews, Billy Cade and others, were present; at conversation,
witness asked prisoner where he was hit; prisoner placed his
hand on back of his neck and said it was there; prisoner said
nothing else, at that time, that witness recollects to have
heard; prisoner and deceased were always friendly, when to-
gether, but did not talk so of each other when apart; cannot
say the exact cause of bad feeling; sometimes Stokes would
say something, again another. In a conversation between
prisoner and witness, prisoner said that every man who came
to his house got his wife. Witness told prisoner to name the
man—that it was a lie, for he, witness, had been there sever-
al times and he, witness, had not; prisoner named deceased
and Sam Hill. Witness replied, I have nothing to do with
Hill; but if you know anything, Armstead, against Henly,
I want you to name it. Prisoner said Henly had caught his
wife by the shoulder and shook her, playing with her. Miss
Campbell was present and remarked—Stokes, you know bet-
ter; it was me whom he took by the shoulder, and was play-
ing with, and not your wife. Prisoner applied to me for room
to put his clothes in—that he intended to leave home, for he
could not stand the way they were carrying on there; that

whenever he said anything they threatened to whip him and abused him; that Sam Hill and others did so; he said noth-ing there about Henly; witness did not say to Wade Stokes on the road to Augusta, that prisoner had come to him to get board or a room, because Henly and others carried on so at his house that he could not stay there. John Stokes and Os-car Dent were present, in a buggy, about 40 feet from priso-ner and myself, during the conversation above. Witness has not subscribed money or employed Counsel to aid in this pros-ecution; is under no promise to do so; only asked Mr. Ste-phens and Mr. Thomas why they withdrew from the prose-cution, and stated to them that Heard had told me the money was made up.

Dr. JOHN H. WALTON, sworn: Was present at the inquest held over the body of deceased, and assisted in examination; the wound was in the right breast, one and a half inches from sternum, between 2nd and 3d rib; cut through anterior por-tion of the right lobe of the lungs, then through the pericardi-um or thin membrane that covers the heart, then cut the aorta about inch and half above the heart—such wound ne-cessarily produced instant death.

Cross-examined: Heart below liver, of which the knife en-tered above two inches or more.

Direct, resumed: From direction of wound, it could have been inflicted either from behind or from the left of the per-son receiving it.

Cross, resumed: For such a wound to have been inflicted when the two men were of equal height, it was necessary that the party inflicting it should be on one side to the right; it could not be inflicted by one person standing behind another and striking directly over the shoulder.

## EVIDENCE FOR THE PRISONER.

JOHN STOKES, sworn: Is son of the prisoner; was present on the day that Henly and Mr. Dent took dinner at priso-ner's house; was in an adjoining room in bed sick; partition

Stokes *vs.* The State. ·

between; dinner table visible but not bed.   Prisoner came to house half hour before Henly and Dent came to house; prisoner and wife were quarrelling.   Mr. Henly came in to dinner, and prisoner's wife said, if you knew what Stokes has been saying about you, you would give him a thrashing that minute.   Mr. Henly then said, Armstead, if you will walk out into the road, I will give you a thrashing.   Henly threw his hankerchief in prisoner's wife's lap, and went out first, prisoner next, and Dent next, passing through the room where witness was confined by sickness; saw them no more afterwards.

Cross-examined: The bed in which witness was lying was in such a situation he could see out to the road; did not tell any one that he saw the difficulty; did not tell Mr. Andrews so; did not tell him, on the Monday after homicide occurred, that the difficulty occurred about making a coffin lid for Mr. Wiseman; did not tell him that prisoner never had cause to be jealous of Mr. Henly; never told Mr. J. Willis so at any time.

Direct, resumed: Did not recollect what prisoner said at first of the quarrel between prisoner and wife, before Henly came, but heard his wife say her arse was her own, and Henly could do it as well as any body.   On the night of the moving to Augusta does not recollect hearing prisoner tell Mr. Henly he wished him to keep away from there; but has, at various other times, heard him tell him so.   Has seen Henly and prisoner's wife go off together, and has stated so to his father privately.

JOHN ANDREWS, sworn: Never heard deceased say that prisoner had forbidden him his house; had heard him say that prisoner had threatened to kill him, but he was not afraid of his doing it, and was present when prisoner was arrested; heard him say he had killed him and he would do it again, and that he was sorry for it, but he would kill the best friend he had, under the same circumstances; said Henly struck him with a stick on the back of his neck; got there about one hour

Stokes *vs.* The State.

after Henly's death. Willis, and Dent, and Curry were there, and others; heard nothing about pistol.

Direct: Staid there all the time till prisoner was arrested.

.ARCHIBALD N. SAYRE: Some six or eight months before the homicide, on his return from Anthony Shoals Factory, saw Stokes on an island in the river, and on the way from there he told me to tell Henly to keep away from his house, and let his wife alone; if he did not he, prisoner, would kill him; told him if he wanted such messages borne he must bear them himself.

Cross-examined: Stokes was very drunk at the time; saw Stokes and Henly together very frequently about a week afterwards, when Stokes invited Henly, pressingly, to come to his house; inquired why he staid at home so close. Have known prisoner since 1832; very often drunk; hardly ever from under the influence of liquor; never had many fights, though a great hand to get up difficulties, and very abusive, till he saw his abuse about to be resented; never knew him to strike any body. Has heard prisoner, on one occasion after the first conversation, say that his wife was too familiar with other men, and that he was going to quit home on that account; comparatively sober then. Stokes said he left his wife very drunk.

HENRY CAMPBELL: On the night witness and family went to Augusta, camped at Stokes'; Jack Dallas, James Henly, the deceased, and Wm. Dent and George House were there; in November preceding the homicide, thinks on the 12th, heard prisoner tell the people there to go home; saw no one but Henly have liquor there that night; he had a flask; Henly and the others refused to go, and staid till nearly day; saw Mrs. Stokes and Henly standing out in the yard, between midnight and day; has heard Mr. Stokes tell deceased if he did not go away and keep away from his house, and let his business alone, he would kill him. Mr. Stokes was not drinking that night, and had not been at midnight.

Cross-examined: Henly and the others came about twelve o'clock at night; witness left for Augusta on Thursday after

the homicide happened; has been at Mr. Stokes' house once since. Gibson House was present when prisoner told deceased to keep away from his house.

Dr. D. M. ANDREWS does not think such a wound as deceased's could be given directly over the shoulder; thinks the direction of the knife would be horizontal in a wound given between the second and third ribs, to reach aorta an inch and a half above its junction with the heart.

Cross-examined: Thinks, if the prisoner was standing a little behind, to the right, such a wound could be given.

Dr. WALTON, (recalled): Sustains Dr. Andrews.

WM. W. STOKES: On the road to Augusta, Mr. Andrews told the witness that prisoner had been to his house and applied for a room; that he did not want such a set about him; that Stokes had told him he was annoyed by Hill, Henly and others; has known prisoner from a boy; has never known him to offer personal violence to any body. Prisoner has been intemperate from a boy, except a few months.

Cross-examined: Is certain it was Hill, Henly and others that Mr. Andrews told witness, Stokes said were annoying him; conversation took place some months previous to the killing.

N. G. BARKSDALE: Stokes has always been considered a peaceable man; has known him from boyhood; Stokes is about 40; has never known him guilty of any violence.

WM. ANDREWS re-called: Had a conversation with John Stokes, on the Monday after homicide happened; asked him how accident occurred; he said Ma and Pa had been quarrelling ever since Sam Hill was over there, and that cousin James Henly's name was not named—but Mrs. Stokes said, if you knew what Stokes has been saying about you, you would not stand it; Stokes said I have not said a word about him, and if he had said anything about him he would not deny it. Mrs. Stokes said that Stokes had said that Henly charged 2½ dollars for making a coffin for old man Wiseman, who died at Henly's house, and had kept the balance of the money. Henly said it is not so Stokes, and you know it—and if you

will go to the road with me, I will give you a thrashing. Wiseman was sick, and died at Henly's. John Stokes said he heard prisoner say to Henly, if he was going to give him a whipping, he was ready; Henly replied, go to the big road, he would not fight him in his yard. John Stokes said he got up and sat on his bed at the window; Henly went out of the gate—his father behind him, and Dent next. Dent stopped to shut the gate; after getting out of the gate a few steps, he stooped, as if he had dropped something; picked it up; stepped a few steps a little farther, and struck Henly over the right shoulder, and Henly fell; prisoner stooped down afterwards—whether it was to pull the knife out, or to look at the wound, he could not say.

ISAIAH T. WILLIS: Had a conversation with John Stokes on the Sunday after the homicide, when he said he had never seen anything amiss between James Henly and his stepmother.

N. G. BARKSDALE: Is acquainted with the general reputation of Wm. Andrews in the vicinity where he lives; from that reputation, would question it.

WM. CADE: Has been long acquainted with Wm. Andrews; from his knowledge of him, would believe him on his oath.

Cross-examined: Has contributed to this prosecution.

F. E. SMITH: Is acquainted with Wm. Andrews; from his knowledge of his reputation, would believe him on his oath; has contributed to this prosecution.

WM. HOUSE: Knows Wm. Andrews, (knows nothing very bad about his character); have not contributed to this prosecution, but expects to do it; would believe him on his oath in a Court of justice.

When Wm. Andrews was offered to be sworn on behalf of the State, Counsel for prisoner objected to his being introduced as a witness, on the ground that the list of witnesses furnished to the defendant by the Solicitor for the State, included only the two witnesses sworn before the Grand Jury, and Dr. Walton substituted for Dr. Whitlock, who had departed this life; and that no notice of the said Andrews be-

ing expected to be introduced as a witness in this case had over been given to the defendant or his Counsel.

The Court over-ruled the objection, and Counsel for defendant excepted.

Wm. House, introduced by the State to sustain the character of Wm. Andrews, in answer to the usual question, as to character for truth and veracity, answered, that "he *knows* nothing very bad about his character." Counsel for defendant proposed to ask him, "Have you never *heard* anything very bad against his character."

The Court ruled out the question, because it was not confined to his character for truth and veracity, and defendant excepted.

Afterwards, on motion of the Counsel for the State, the Court struck out the testimony of House, that "he knows nothing very bad about his character." To which decision, defendant's Counsel excepted, because said evidence was legal.

After the defendant had introduced his testimony, the Court charged the Jury as follows:

## CHARGE.

"Gentlemen of the Jury—the law having made the Jury the judges of the law, as well as the fact, I would prefer to decline charging you altogether; for it seems inconsistent that I should propound the law when you are at liberty to disregard the Court. Yet, so it is, while it is my duty to give you in charge the law, you are at liberty to abide, or not, by the Court's exposition of the same. The Court, therefore, will say but little to you in the way of charge, as you are judges of the law as well as the fact. I will read to you the law which, I think, most relevant to the case, and read it deliberately. The Court then read to the Jury the following sections of the fourth division of the Penal Code: *two*, *three*, *four*, *six*, *seven*, *twelve*, *thirteen*, *fourteen*, *fifteen and sixteen*, and proceeded as follows:

If it is satisfactorily proven to you that the prisoner slew the deceased, Henly, the next inquiry is, has the offence been reduced to an offence lower than murder by the proof? To make the homicide murder, it must have been committed with malice aforethought, express or implied. It is for you to judge, from the evidence, whether there are any circumstances proven to show express malice. If no express malice has been proven, then you may believe and find implied malice. If you are satisfied that the homicide was committed without considerable provocation, and that all the circumstances show a malignant and abandoned heart, you can find that it was instigated by implied malice.

I deem it necessary only to examine whether the offence has been reduced to voluntary manslaughter or to justifiable homicide. The offence could not be reduced to voluntary manslaughter by any provocation of words or threats; there must have been some assault by Henly on the prisoner, or an attempt, by Henly, to commit a serious personal injury on him, to reduce the crime from murder to manslaughter.

The Court is of opinion that jealousy was not a sufficien provocation to reduce the homicide to manslaughter. Upon this subject we must speak in the language of the law, and not from the promptings of our feelings.

To ascertain whether the homicide be justifiable, the Court deems it necessary only to inquire whether it was committed in self-defence? And to make the homicide justifiable on this ground, you should believe that the killing was absolutely necessary to prevent the injury apprehended from the deceased. If you believe the prisoner could have prevented injury to himself by declining to fight with deceased, and that the latter was not the assailant, then the offence is not justifiable homicide. You must bear in mind the distinction between slaying to *prevent* an injury, and slaying in *revenge* of an injury. The former may justify when the latter will not.

The Court is of opinion, that if the prisoner slew the deceased on account of jealousy, the case does not stand upon the footing of reason and justice that will reduce the killing

from murder to justifiable homicide. Neither is the Court of opinion that it is justifiable on account of self-defence, upon the footing of reason and justice, unless the Jury shall be of opinion that the danger to prisoner was so urgent and pressing, at the time of the killing, that, in order to save his, the prisoner's life, the killing of Henly was absolutely necessary.

It was not justifiable to slay deceased from a dread or suspicion that he would commit adultery with prisoner's wife. If he had endeavored to enter the house for that purpose, against the consent of prisoner, he might have been resisted at the sacrifice of his life.

If you find the prisoner guilty of manslaughter you must say whether it is voluntary or involuntary, because the punishment is different.

The Court has been requested, in writing, by prisoner's Counsel, to charge:

"That if the Jury believes, from the evidence, that this case stands upon the same footing of reason and justice as those enumerated in the 4th division of the Penal Code, the homicide is justifiable."

The Court charges the above to be true, with these modifications:

1st. That as regards self-defence, it is provided for under the said 4th division, and is there enumerated and met by what the Court has already charged.

2d. As regards intercourse with prisoner's wife, the Court is of opinion that it would not have been justifiable to slay deceased because of previous or apprehended future adultery; but if deceased had been about to enter the house of prisoner against his consent, to commit adultery or rape, *that* would fall upon the same footing of reason and justice as those cases enumerated in the said 4th division in the Penal Code.

To which charge the defendant's Counsel excepted—

1st. That the Court erred in charging that there must have been some assault, by Henly, on the prisoner, or an attempt,

by Henly, to commit a serious personal injury on him, to re-duce the crime from murder to manslaughter.

2d. That the Court erred in charging, "that the Court is of opinion that jealousy was not a sufficient provocation to re-duce the homicide to manslaughter—upon this subject we must speak in the language of the law, and not from the promptings of our feelings."

3d. That the Court erred in charging, "I deem it neces-sary only to examine whether the offence has been reduced to voluntary manslaughter or justifiable homicide;" thereby excluding from the Jury the question as to involuntary man-slaughter, and expressing, thereby, an opinion on the evi-dence.

4th. That the Court erred in charging, that "to ascertain whether the homicide be justifiable, the Court deems it ne-cessary *only to inquire whether it was committed in self-de-fence.*"

5th. That the Court erred in charging, "that slaying in revenge of an injury cannot, in any event, justify a homicide."

6th. The Court erred in charging, that if the deceased was not the assailant, "then the offence is not justifiable homi-cide."

7th. Because the Court erred in charging, that "neither is the Court of opinion that it is justifiable on account of self-defence, upon the footing of reason and justice, unless the Jury should be of opinion that the danger to prisoner was so urgent and pressing at the time of the killing, that in order to save his, the prisoner's life, the killing of Henly was ab-solutely necessary.

8th. That the Court erred in charging, "that it was not justifiable to slay deceased from a dread or suspicion that he would commit adultery with prisoner's wife—if he had en-deavored to enter the house for that purpose, against the consent of prisoner, he might have been resisted at the sacri-fice of life."

And to which refusal to charge, in the words requested by

defendant's Counsel, and to the charge as given, Counsel for defendant excepted, on the following grounds:

1st. Because the Court erred in not giving the charge requested, without modifications.

2d. Because the modifications of law, as given by the Court, were illegal.

3d. Because the Court erred in charging that the request of prisoner was true, with these modifications: First, That as regarded self-defence, it is provided for under said fourth division, and is there enumerated and met by what the Court has already charged. Secondly, As regards intercourse with prisoner's wife, the Court is of opinion that it would not have been justifiable to slay deceased because of previous or apprehended future adultery; but if deceased had been about to enter the house of prisoner against his consent, to commit adultery or rape, *that* would fall upon the same footing of reason and justice as those cases enumerated in the fourth division of the Penal Code.

The Jury then retired and found a verdict of "guilty."

A new trial was moved, on the ground that the verdict was contrary to the law and evidence; and also, on the several alleged errors excepted to as above.

The Court refused a new trial, and defendant's Counsel excepted.

On these several exceptions, error has been assigned.

Toombs; T. R. R. Cobb, for plaintiff in error.

Sol. Gen'l Weems; Barnett, for the State.

*By the Court.*—Benning J. delivering the opinion.

A part of the charge of the Court complained of, was as follows: "There must have been some assault by Henly on the prisoner, or an attempt by Henly to commit a serious personal injury on him, to reduce the crime from murder to

manslaughter." According to this, no case of homicide can be a case of manslaughter, unless it be one in which the person killing was first assaulted by the person killed. According to this, therefore, if, in a sudden fight, without weapons, and one entered into with equal willingness by both parties, the party who happens to give the first blow kill the other; or, if a husband, taking a man in the act of adultery with his wife instantly kill him, the homicide cannot be manslaughter, but must be murder.

Is this law?

If it is, it must be for the reason that it is made law by the seventh section of the fourth division of the Penal Code, which is in these words: "In all cases of voluntary manslaughter, there must be some actual assault upon the person killing, or an attempt by the person killed to commit a serious personal injury on the person killing. Provocation by words, threats, menaces or contemptuous gestures, shall in no case be sufficient to free the person killing from the guilt and crime of murder. The killing must be the result of that sudden, violent impulse of passion supposed to be irresistible; for if there should appear to have been an interval between the assault or provocation given, and the homicide, sufficient for the voice of reason and humanity to be heard, the killing shall be attributed to deliberate revenge, and punished as murder."

Does this section make the charge law, and put the cases aforesaid out of the class manslaughter into the class murder?

If it puts those cases out of the class manslaughter, it must, of necessity, put them either into the class murder or into the class justifiable homicide; for there can be no case of homicide which does not fall into one or another of these three classes. "Homicide is the killing of a human being of any age or sex, and is of three kinds: murder, manslaughter and justifiable homicide." (*Code.*) According to the Court below, the section puts them into the class murder.

But that class will not receive them unless forced to do it, for they are cases unaccompanied by malice; and malice is

Stokes *vs.* The State.

the distinguishing mark of all cases of homicide that are mur- der. They are cases in which is wanting a " deliberate in- tention" to take life—such a " deliberate intention" as "is manifested by external circumstances capable of proof." Therefore, they are cases free from *express* malice. They are cases, in respect to neither of which can it be said that it is a case "where no considerable provocation appears, and where all the circumstances of the killing show an abandoned and malignant heart." Therefore, they are cases free from *implied* malice. (*Code, 4th Div.*)

These cases, therefore, cannot be got into the class mur- der, without the doing of great violence to the definition of murder.

Neither can they be got into the class justifiable homicide, without the doing of equally great violence to the law defin- ing or designating justifiable homicide.

What then ? Shall we exclude these cases from every one of the three classes of homicide ? That cannot be, for the law says that every case of homicide is to be included in some one of those classes.

In some one of the above classes, then, we have to include the cases. Which shall it be ? Manifestly, that class into which the cases will go most easily—will go by the use of least force. And that one is manslaughter. The *definition* of manslaugh- ter is such, that if it stood alone, the class manslaughter would receive them readily—without having in the least to be forced. " Manslaughter is the unlawful killing of a human creature without malice, either express or implied, and without any mixture of deliberation whatever." (*Code, 4th Div,*) This is not true of the definition of murder, or the definitions of justifiable homicide. To make the definitions of those two classes of homicide such that they would receive these cases, would be to so change them as to destroy their characteristics. It is true, the definition of manslaughter does not stand alone. It is accompanied by the said seventh section, which declares, that "In all cases of voluntary manslaughter, there must be some actual assault upon the person killing," &c. But it re-

quires a less degree of force to let the definition control this section than to let this section control the definition; for if we let the section control the definition, we have also to let it control another definition—that of murder; and so to control that definition as to make it say, that there may be cases of murder without malice.

[1.] The result is, that these cases have to be considered, not cases of murder, but cases of voluntary manslaughter: And if that be true of these cases, then it may be laid down as a rule, that no case of homicide can be a case of murder, if it is not accompanied by malice, either express or implied; and that every case of homicide not so accompanied, is, notwithstanding the said seventh section, a case of manslaughter, unless it be a case of justifiable homicide.

Is that section, then, to have no effect? By no means. It is to be used to help us arrive at what is malice—*implied* malice. "Malice shall be implied where no considerable provocation appears, and where all the circumstances of the killing show an abandoned and malignant heart." And that section says: "Provocation by words, threats, menaces or contemptuous gestures, shall, in no case, be sufficient to free the person killing from the guilt and crime of murder." This is as much as to say, that provocation by "words," &c. is not "*considerable* provocation"; and that if life be taken in consequence of such provocation, it will be taken under circumstances which will "show an *abandoned* and *malignant heart.*" In short, it is as much as to say, that notwithstanding any provocation by "words," &c. malice shall be implied.

I incline, very much, to think that the true meaning of this seventh section is this, viz: in all cases of homicide, in which the provocation is but "words," &c. the offence shall not be reduced from murder to manslaughter; in all cases of homicide, where the provocation is "some actual assault," the offence may be reduced from murder to manslaughter, if there is not a sufficient cooling time between the assault and the killing. This, I incline to think, is the true meaning and the whole meaning. I cannot think the section was intended to

affect cases, in which the provocation was neither " words," &c. nor " some actual assault,"—was intended to affect the case, for example, of the man whose provocation is an act of adultery with his wife, committed under his own eyes.     (4 *Black. Com.* 192.)

If what has been said is true, it follows that the Court below, in charging the Jury that " There must have been some assault by Henly on the prisoner, or an attempt, by Henly, to commit a serious personal injury on him, to reduce the crime from murder to manslaughter," stated the rule too broadly, and that the Court should rather have charged the Jury, that although there might have been no assault committed by Henly on Stokes ; yet, if Stokes had other and very great provocation from Henly, such provocation as that which a man has who takes another in the act of adultery with his wife ; and if all the circumstances of the killing showed that he acted from a sudden, violent heat of passion, occasioned by such provocation, and not from the promptings of an abandoned and malignant heart, of all which they must judge from the evidence, then the homicide would be no more than manslaughter.

The Court held, that to impeach a witness on the score of character or reputation, it is necessary that the examination be confined to his " character for truth and veracity."

[2.] In *Phillips on Evidence*, 1, 292, it is said that " The regular mode of examining into general character, is to inquire of the witnesses whether they have the means of knowing the former witness's general character ; and whether, from such knowledge, they would believe him on his oath ?" With Phillips agree Starkie, (*Stark. Ev.* 182,) Greenleaf, (*Green. Ev. Sec.* 461,) and Cowen & Hill (*Cow. & Hill's Notes to Phill. Ev. note* 531,) as also does the case of *Rex. vs. Bispham*, (4 *Carr. & P.* 392.)

We think that the weight of authority is with Phillips ; and therefore, that the rule, as laid down by the Court, is too narrow.

Wherefore, it seems to us, that under the New Trial Act of 1854, a new trial ought to be granted.