## Thomas W. Hamilton v. The People.

*Criminal law: Commitment for trial: Holiday: Examination.* A commitment for trial is not void where a prisoner was arrested and brought before a magistrate on a valid complaint on the 21st of February, and the examination continued from day to day for several days, one of which,—the 22d,—was a legal holiday.

*Examination: Judicial proceedings: Adjournments: Records: Irregularities.* Proceedings of this nature are not "judicial proceedings" in the technical sense of the term, and when once commenced, on proper complaint and arrest, will not abate before the final disposition by discharge or commitment. The proceedings are not technically records, and do not require technical nicety as to adjournments; and irregularities therein cannot be considered on the subsequent trial of the prisoner on the merits.

*Informations: Motion to quash: Preliminary examination.* A motion to quash an entire information for want of a preliminary examination as to a part only of the counts, cannot be granted. It should be confined to counts plainly specified.

*Informations: Misjoinder of counts: Demurrer: Motion to quash: Practice.* A misjoinder of counts is not ground of demurrer, but may be of a motion to quash. Such motion should be granted when otherwise the defense would be subjected to serious danger of surprise or perplexity in preparing for trial. But in cases where all the counts may refer to one transaction, the respondent can be sufficiently protected by confining the proof on the trial to such matters as relate to that, and which he may be expected to be prepared to meet.

*Motion to quash: Discretion.* A motion to quash is usually discretionary, and is not reviewable when it rests in discretion and not in right.

*Evidence: Chancery record: Motive: Burning property to defraud insurers.* Where a person was charged with burning property to defraud insurers, evidence of a pending chancery suit concerning the title should not have been introduced to show a motive to defraud, when the time for taking proofs had expired some time before the fire, and the answer denied the equity of the bill. *A fortiori*, evidence of a suit brought subsequent to the fire was improper.

*Evidence: Res gestæ: Motive.* It is not improper, on an indictment for fraudulently burning a barn, without any allegation as to burning its contents, to show what was in it. The whole transaction should be open to the jury, and the fullness or emptiness of the barn might bear upon the motive to destroy it.

*Statements: Admission.* A statement, made several months after the barn was burnt, that *the respondent had a good insurance on his house, and it might go to blazes with the barn,* is not an admission that he burned the barn.

*Evidence: False statement: Res gestæ.* A false statement made by one of the defendants after the fire, to the import that the barn was not insured, is no part of the *res gestæ,* and could not aid in defrauding the insurers, and should not have been received against another defendant.

*Statements of third persons: Hearsay.* Statements of fact given by a third person to a witness are pure hearsay, and inadmissible in evidence.

*Evidence: Conspiracy: State's evidence: Cross-examination.* Where a witness who had turned state's evidence stated that a dance was got up as a part of the plan for drawing off attention from the proposed fire, evidence that the dance had been arranged before the time when that witness fixed the con-

spiracy, is legitimate to contradict him; and in this case it was also proper cross-examination of another government witness, who had testified that there was such a dance, and had described what took place at it.

*Conspiracy: Circumstantial evidence: Impressions: Bribery: Subsequent suspicions.* A witness who swore to seeing the three defendants conversing by themselves soon after the fire, should have been allowed to be cross-questioned whether this impressed him at the time, and when he first mentioned it. It is always important to know whether impressions have been warped or changed by subsequent suspicions, or whether at the time they were such as to strike attention and become accurately fixed in memory. The whole value of circumstantial evidence depends on the truth and accuracy of observation.

*Witnesses: Procuring testimony: Cross-examination: Bribery: General statements: Evidence: Statements referring to the case at bar.* Evidence that a witness has been active in procuring testimony may be received to impeach him, when he has denied it on cross-examination.—*Geary v. People, 22 Mich. R.*, 220, followed as establishing the same principle as to bias or interest. But evidence of general statements of such a witness, not made in connection with this case, that he was open to bribery, would be collateral and inadmissible. But such statements referring to the case at bar would be material.

*Witness: Cross-examination: Desertion: Charged with crime.* A witness may be asked on cross-examination if he has been guilty of desertion, or charged with crime.

*Evidence: Burning property: Probabilities: Circumstantial evidence.* It was error to exclude testimony for the defense that persons had been in the habit of playing cards in the barn with lights; as fire might have taken in that way, and all circumstances bearing on the probabilities were material.

*Witness: State's evidence: Privileges: Waiver: Confidences: Client and counsel.* A person who turns state's evidence and swears to an offense in which he was a party, thereby waives his privilege against criminating himself in that matter, and has no right to set it up as to statements made to his counsel, or to refuse answering himself. The privilege as to confidences between client and counsel are for the client's benefit, and may be waived by the client, and all privileges are waived by a state's evidence, in regard to the facts in controversy. He must disclose fully.

*Evidence: Answer not responsive: Objections: Depositions.* When a witness gives an answer not responsive to a question, but which would have been admissible if he had been asked about it, no one can object to it as not responsive but the party questioning. If he is willing to receive it, his adversary cannot have it stricken out. The rule may be different when testimony is taken by deposition, as counsel may in such case lose the opportunity of putting further questions to follow it up.—*Greenman v. O'Connor, 25 Mich. R.*, 30, distinguished on this ground.

*Impeachment: Sustaining witness: Cross-examination: Reputation.* Where a sustaining witness testifies to the good repute for truth of an impeached witness, he may be asked on cross-examination whether he would believe the latter on oath. The subject of impeaching witnesses discussed, and Mr. *Greenleaf's* statement as to the American doctrine criticised.

*Reputation of witness: Time of trial: Place: Change of domicile.* The object of inquiring into reputation for veracity is to ascertain the witness' standing at the time of trial, and the inquiry should be directed to that time, although it may extend over a reasonable time, and in different places, where there has been a change of domicile.

*Informations: Improper counts: Discontinuance: Acquittal: Practice.* Where an information contained counts not charging all the defendants jointly, and counts charging a different offense from that on which they had been examined, the court erred in not directing a discontinuance or acquittal on such improper counts, and should not have received testimony under them.

*Charge to the jury : Accomplice : Credibility.* A jury cannot be instructed that they are bound to accept and credit testimony of an accomplice, either standing alone or more or less corroborated. It is their province to determine whether he is to be credited at all, and if so, to what extent.

*Credibility of witnesses : Question for the jury.* And if they believe a witness has wilfully falsified in any particular they are not required to credit him in other matters, unless convinced that he has, as to such matters, sworn truly. As they know he will not be restrained by his oath, they must judge for themselves how far, if at all, corroboration in some particulars renders it safe to believe him. The court cannot require them to credit testimony under any circumstances against their own conclusions from it.

*Criminal trials : Jury : Questions of law : Charge to the jury.* The jury are bound to receive the law from the court in criminal as well as civil cases. They are only judges of law and fact in the sense that their verdicts are not always open to correction when they choose to disregard the law. But the power of giving wrong verdicts with impunity does not render such verdicts right.

*Questions of law : Court : Jury.* Certainty in the law, as far as attainable, is necessary for private and public security, and this can only be had by leaving it to the courts to declare the law, and not by leaving it open to the varying opinions of different juries.

*Charge to the jury : Comments on the facts.* Where a charge explicitly and positively informs a jury that they have the exclusive right to determine upon the facts, it will not be held erroneous for such remarks upon facts as are not calculated to mislead them as to their rights and responsibilities.

*Charge to the jury : Reasonable doubt : Subtleties : Technicalities.* Juries are presumed to have common sense enough to need no metaphysical explanations of what will constitute a "reasonable doubt." It is not desirable in jury trials to introduce such subtleties and technicalities of language as are more likely to confuse than to instruct them.

*Heard January 27 and 28.   Decided April 8.*

Error to Calhoun Circuit.

*Brown & Patterson* and *M. S. Brackett,* for plaintiff in error.

*Byron D. Ball, Attorney General,* for the People.

CAMPBELL, J.

The defendants were indicted for burning a barn, with intent to defraud an insurance company. The conviction was had of this plaintiff in error (defendants below being tried separately) upon the testimony of William Fuller, who was sworn as state's evidence. Questions arose below on some preliminary matters, and upon the sufficiency of the information, as well as on points ruled at the trial.

A considerable part of the record is taken up with the various rulings and proceedings upon pleadings in abatement, which preceded the issue of not guilty.

The plea relied upon was, in brief, that the complaint before the justice of the peace was brought on for examination on the 21st of February, 1872, and after it had been partly completed it was adjourned until the 22d, when some further testimony was taken and an adjournment was had until the 23d, and thereafter the proceedings went on to completion. The objection relied on is that the 22d of February being not a law day, the justice lost jurisdiction.

This is all that appears in the original plea; and admitting it to be true, and without reference to the subsequent proceedings at the circuit on either side, we do not think it can be sustained.

The justice, in these examinations, does not act judicially, in the technical sense, but in his capacity of a conservator of the peace, and the proceeding is one which, at common law, was conducted very much at discretion. It is possible that the regularity of the arrest and continued custody of the prisoners may have been open to question; but we have found no authority for holding that a criminal examination before a justice is void, if a complaint has been made before him on oath, and the accused are finally held to bail or committed on a law day upon testimony taken in their presence in pursuance of it. Whether irregular or not, we find no authority for regarding such proceedings as nullities. We can see no reason why a complaint properly verified should cease to be valid to maintain an examination, unless the parties accused are either discharged or held to commitment, so long as there is no substantial break in the proceedings. No formal record is required to be kept of them, and the continuance from day to day is not an adjournment of such a nature that the failure to announce it would be of any consequence. The proceedings are by the statute contemplated as contin-

nous, unless formally adjourned from time to time, and the close of business on one day would carry it over until the next business day as a matter of course, unless otherwise ordered.   The adjournment to the 22d, if illegal, would not interrupt the legal course, which would take the matter over to the 23d; and whether the justice did or did not consider some testimony which was not admissible because irregularly taken, his discretion in ordering the commitment cannot be reviewed in any such way as proposed here.

The plea does not dispute the fact that there was a preliminary examination upon a proper complaint before a magistrate having jurisdiction, resulting in a commitment; and this, we think, was all that was necessary to justify proceeding by information.

A motion was made to quash the information, resting mainly on the misjoinder of counts, the insufficiency of some of them, and the want of a preliminary examination upon some of the charges.

It was held in *Washburn v. People, 10 Mich., 372,* that the fact of examination need not be alleged in the information, but that the objection must be made by motion to quash, or plea in abatement.   It is not claimed by the motion that there was no examination, but only that it did not cover all the counts; and the counts objected to for that reason are not specified.   As the motion to quash the whole information could not properly prevail on this ground, and the parts objected to are not specified, we think that objection was not tenable in the form resorted to.   The question of misjoinder is more serious, and rests on different grounds.

The complaint before the magistrate and the information are both so confused and multifarious that the court below might very properly have declined to compel defendants to go to a trial.   We have seldom seen pleadings so fairly open to criticism on this head.   Offenses are charged to which all the defendants could not possibly be amena-

ble.    Some counts charge no offense at all; others contain
the charges upon which we suppose the trial was really
had, and upon these there is, we think, no fatal objection,
as the rules of criminal pleadings under our statutes justify
the introduction of various counts charging the ownership
of the property burned, and the position of the respondents
as principal or accessorial offenders, in different ways.—See
*Annis v. People, 13 Mich., 511.*

It is intimated in *The King v. Kingston, 8 East R., 41,*
that a demurrer would not lie to the whole information
for such a misjoinder; but that the proper remedy was by
motion to quash.    Such a motion is addressed to the dis-
cretion of the court.    It ought to be granted where the
confusion is such that it is likely to interfere with the
means of defending, by misleading or perplexing the pris-
oner in meeting the case or preparing for trial.    But when
the court can prevent any mischief, as it usually can, by
confining the proof to the single transaction on which
the defendant was examined, or on which the prosecution
has opened the testimony, or by compelling an election in
the outset, no wrong is done by the refusal to quash.

We do not hold that, under our statutes, requiring a
motion to quash in lieu of a motion in arrest or to save a
ground of error, such a motion is always discretionary.
But such a motion for misjoinder appears to be discretion-
ary.—*1 Bish. Cr. Pro.,* § *447; The King v. Kingston, 8
East, 41.*

Where the various counts may all refer to the same
transaction, the safer course usually is, undoubtedly, not to
quash, but to regulate the proof on the trial as far as may
be necessary to prevent surprise or the misleading of the
prisoner, and to confine it to that transaction.—See *Rex v.
Young, R. & Ry., 280 (n.); Rex v. Ellis, 6 B. & C., 145;
Anonymous, 2 Leach C. C., 1105.*

We had occasion at the last term to consider and sus-
tain the propriety of allowing proof of the entire transac-
tion, in *People v. Marion,* and *Van Sickle v. People.*

We think there was no ruling below which we can properly review, which rendered it erroneous to put respondents to their trial, although the misjoinder was gross and improper.

The court on the trial regarded the case as one where the offense was that of burning property with intent to defraud insurers; and it was tried entirely on that theory. The questions raised and discussed on the exceptions and charge are to be considered in view of such a state of facts.

The theory of the prosecution depended entirely on the evidence of the respondent Fuller, who swore to a plan, made in advance, to burn the barn in question, by putting a lighted candle in a place where, as it burned low, it would reach litter and other combustible material, and set it on fire. It was to operate like a slow match. There is no direct evidence of the guilt of any of the defendants, but they were convicted on circumstantial evidence, which derived its force chiefly as explained by Fuller's testimony concerning the previous arrangement. With that out of the case, or discredited, no conviction could have been justified.

The first ruling objected to and mentioned on the argument, related to the admission of certain chancery records, showing that in 1869 a bill was filed to rescind the conveyance of the land on which the barn was situated. The ground set up in the bill was fraud alleged to have been practiced by Thomas W. Hamilton and one Nathaniel Badger. The object of this testimony was claimed to be to establish a motive to account for the destruction of the property, by showing a dispute affecting title. It was admitted against the objection, and the court afterwards refused to strike it out.

We are inclined to think that evidence of an existing controversy of that sort would have some bearing on the question of motive, although there may be difficulty in guarding it so as to prevent the jury from passing upon

the facts of that controversy, which could not lawfully be done.    But it appeared from these files that the case was brought to an issue on bill, answer and replication, more than a year before the fire, and that no proofs had been taken. As it was then too late to take proofs, and the answer denied the equity of the bill, and, therefore, as the case then stood, the defendants were vindicated, we can see no reason for permitting the bill to be introduced ; and allowing it to be received as evidence that respondents had a motive to burn the insured property, was injurious and erroneous.    Still more objectionable was the introduction of foreclosure proceedings commenced after the fire, which could, under no circumstances, furnish proof of a motive. The condition of the title at the time of the fire was open to proof more directly, and could not properly be shown in this way.    No other legitimate inquiry could have been aided by any proceedings *ex post facto*.

Objection was made to the reception of certain evidence of the amount of hay in the barn, that there was no valid count charging the burning of any thing but the barn, and that respondents had not been examined upon such a charge.    We think that the fact of the fullness or emptiness of the barn might have a very clear bearing upon the question of motive in burning the barn; and we can see no reason for excluding any circumstance showing the extent of the fire and of the property burned.    The whole transaction was properly open to the jury, and they were entitled to understand it all.

The testimony of Robert Billingsly that, in a conversation four or five months after the fire, defendant, when asked whether he could keep the farm, said " he did not care; that he had got a good insurance on the house, and it might go to blazes with the barn," was not, we think, proof of any admission that the barn had been burned by defendant; and that was the only point on which it can be claimed it had any relevancy.

We also think the defendant · Thomas W. Hamilton

could not properly be charged with the false statement of William Hamilton, the day after the fire, that the building was not insured. It was not a part of the *res gestæ*. It could not aid in defrauding the insurance company in any way, and must be regarded as an independent assertion or act, within the excluding rule in *People v. Knapp.* It does not appear sufficiently under what circumstances a remark, about insurance and the probability of more fires, was said to have been made by the respondent James Hamilton, and we cannot, therefore, determine it to have been erroneously admitted. The same rule will apply to the impeaching testimony on Van Valkenburg's statements about William Hamilton.

We can find nothing which could render it admissible for the witness Hiram Allen to detail what was said by the witness Lettie Campbell, concerning the facts which occurred the night of the fire. It is hearsay, pure and simple.

Henry Hamilton, being called by the prosecution, gave testimony concerning what took place at a certain party or dance at James Hamilton's, the night of the fire. Being asked on cross-examination whether the dance was not talked of some time before it was got up, this was objected to. The defense stated they proposed to show it was talked of, and invitations given, a week or ten days beforehand. The court ruled out the question, and the defense excepted.

To understand the bearing of the question, it will be necessary to refer to the account given by Fuller of the proposed plan for burning the barn. That was, in substance, that in order to prevent any suspicion, a dance should be got up at another person's house, and that during the course of the evening one of the Hamiltons was to go out for a supply of cider, and take advantage of that opportunity to light the candle, which would take some time to burn down to the straw; so that they should be away at the party at the time the fire should break out, and so escape suspicion. If the party had been arranged, and invitations given, earlier than the alleged interview with

Fuller, his whole story would be falsified. This was, then, a vital point in the case. It was very clearly legitimate cross-examination, upon the strictest rules. It referred to the very dance concerning which the witness had been examined in chief, and was quite as relevant to the subject as any of the other circumstances on which he had been questioned. The objection that it would not contradict Fuller, would not if true destroy its relevancy. But whether it would do so or not would be a question of fact. Fuller swore that the conversation took place three or four days before the dance, and it might be longer. This last qualification could not operate so indefinitely as to cover a much longer period; and even if it did, the defense had a right to have the subject fully investigated. But Fuller swore positively that the dance was to be the next Monday evening, which would at any rate confine the preparations within a week. The court erred in shutting out this proof.

We think, also, that when Houseman had sworn to seeing the three Hamiltons apparently consulting together after the fire, the defense should not have been precluded from cross-questioning him as to the force of the impression made on him at the time, and as to the persons to whom he first mentioned it. It is only by thorough sifting that it can be known how much a witness has allowed his memory to be warped by subsequent suspicions. Undoubtedly the real meaning of what is seen is not always understood at the time, and therefore it does not follow that a witness who had no suspicions until afterwards may not have observed and remembered accurately. But whether he has done so or not can never be unimportant. The conclusiveness of circumstantial evidence depends entirely on the assurance that facts have been truly seen and sworn to.

It was manifest error to refuse to allow Ribble to be impeached by testimony to contradict his denial on cross-examination, of the part he had taken in getting up testimony.

This was decided in *Geary v. People, 22 Mich., 220*. But we do not think the evidence of his statement in other cases, or generally, of his being open to bribery, come within any recognized rule of impeachment, unless they have made him a reputation for untruthfulness; and then it is only the reputation which is admissible, and not its cause.

It was not error to allow a witness to be asked if he had deserted, or another witness to be asked if he had been charged with crime. There was no attempt to impeach by contradiction on these collateral matters, and the answers were admissible.

It seems to us that the impeachment of Fuller by Young, and Jane Shutly, should have been received. He had been asked about his statements to them concerning his testimony in this case, and had denied making such statements. Yet Fuller's answer as to Young was ruled out, and Jane Shutly was not allowed to answer. The place and time were fixed with reasonable certainty, no objection for uncertainty being made when he was cross-examined, and his answers having been positive and sweeping, his statements that he had been offered a bribe, and would swear for it, were material.

The same remark will apply to the impeachment of Thomas Mulvany by Nelson Howe, where time and place were fixed accurately, and the fact was recent. We do not see, however, on what principle testimony could have been received concerning the conversation of James Mulvany, who had not been sworn, and was a stranger to the record in the circuit court.

We are also of opinion that the testimony in regard to playing cards in the barn with lights should have been allowed to be fully given. Fire might take from such a cause, and the defense were entitled to show all circumstances reasonably bearing on such a possibility.

Several questions of an impeaching nature were excluded on the ground that Fuller had made them to his counsel, and they were therefore privileged. We think the rule of privilege

was misconstrued.   We have no disposition to narrow or hamper privileged communications between clients and their attorneys or counsel.   We concur fully in the broad and sensible doctrine laid down by *Lord Selborne* in *Minet v. Morgan*, L. R., 8 Ch. Ap., 361, that neither client nor attorney can be compelled to answer and disclose matters of confidence.   But the privilege is one created solely for the benefit of the client, and there is no ground for protection where he waives it.—*1 Greenl. Ev.*, § 243; 1 Stark. Ev., 40; *Benjamin v. Coventry, 19 Wend. R., 353.*

When a co-defendant in a criminal case turns state's evidence, and has attempted to convict others by proof also convicting himself, he has no right to claim any privilege concerning any of the facts bearing upon the issue. He has waived all privileges which would permit him to withhold any thing.—*Foster v. People, 18 Mich. R., 266.* It was expressly held in *Alderman v. People, 4 Mich. R., 414,* that this waiver covered confidential communications to attorneys, and there is no more reason for saving these than for saving the privilege against criminating himself. Each may be waived, and is by such criminating disclosures conclusively waived.   Both client and counsel may be compelled to disclose the client's statements which are pertinent to the issue.

A witness, William Gayton, having been sworn to sustain Fuller's reputation for truth and veracity, was asked whether he had not said at a certain time and place that he would not believe Fuller under oath, and answered that he did not think he had done so at that time, but that it was likely he might have said so at the time of Fuller's arrest for this crime.   This answer was stricken out as not responsive.   He was then asked whether the arrest affected his opinion of Fuller, one way or the other.   This was ruled out, as well as a proposition to show his statements to different persons to the same effect, that he would not believe Fuller under oath.

The objection that the answer was not responsive was

one which did not concern the prosecution, if it was relevant. The party examining a witness may sometimes object to volunteered and irresponsive statements made by a witness aside from his questions. But if he is willing to accept the answer, and if it was one he would have had a right to elicit, the opposite party cannot complain. There are cases, as in *Greenman v. O'Connor, 25 Mich., 30,* where the deposition of a witness is taken on settled written interrogatories, when an answer not called for may be objected to by either party for surprise, inasmuch as, if the question had been so put in writing as to call for it, other interrogatories might have been framed accordingly, which might have led to explanation. But no such difficulty can arise where the witness is examined openly and orally, and where a question calling for such an answer would have been competent. Was it proper, then, to ask a sustaining witness on cross-examination, whether he had said he would not believe the impeached witness under oath?

The purpose of any inquiry into the character of a witness is to enable the jury to determine whether he is to be believed on oath. Evidence of his reputation would be irrelevant for any other purpose. And a reputation which would not affect a witness so far as to touch his credibility under oath, could have no proper influence. The English text-books and authorities have always, and without exception, required the testimony to be given directly on this issue. The questions put to the impeaching and supporting witnesses relate, *first,* to their knowledge of the reputation for truth and veracity of the assailed witness; and, *second,* whether from that reputation they would believe him under oath. The only controversy has been whether or no the grounds of belief must rest upon and be confined to a knowledge of reputation for veracity only. But confined to that, the authorities are harmonious.—*1 Starkie's Ev., 237 & seq.; 2 Phil. Ev. (Edwards' Ed.), 955, 958.* A very recent decision is found in *Queen v. Brown & Hedley, L. R., 1 C. C. R., 70.*

The reason given is that, unless the impeaching witness is held to showing the extent to which an evil reputation has affected a person's credit, the jury cannot accurately tell what the witness means to express by stating that such reputation is good or bad, and can have no guide in weighing his testimony. And since it has become settled that they are not bound to disregard a witness entirely, even if he falsifies in some matters, it becomes still more important to know the extent to which the opinion in his neighborhood has touched him. It has also been commonly observed that impeaching questions as to character are often misunderstood, and witnesses, in spite of caution, base their answer on bad character generally, which may or may not be of such a nature as to impair confidence in testimony. When the question of credit under oath is distinctly presented, the answers will be more cautious.

Until Mr. Greenleaf allowed a statement to creep into his work on evidence to the effect that the American authorities disfavored the English rule, it was never very seriously questioned.—See *1 Greenl. Ev.,* § *461.* It is a little remarkable that of the cases referred to to sustain this idea, not one contained a decision upon the question, and only one contained more than a passing *dictum* not in any way called for.—*Phillips v. Kingfield, 1 Appleton's (Me.) R., 375.* The authorities referred to in that case contained no such decision, and the court, after reasoning out the matter somewhat carefully, declared the question was not presented by the record for decision. The American editors of *Phillips* and *Starkie* do not appear to have discovered any such conflict, and do not allude to it. They do, however, as many decisions do, refer to the kind of reputation which should be shown, and whether of veracity or of other qualities. In *Webber v. Hanke, 4 Mich. R., 198,* no question came up on the record except as to the species of reputation, and the neighborhood and time of its existence; and what was said further was not in the case, and cannot properly dispose of the matter. The objection alleged to

such an answer by a witness is, that it enables the witness
to substitute his opinion for that of the jury. But this is
a fallacious objection. The jury, if they do not act from
personal knowledge, cannot understand the matter at all
without knowing the witness' opinion, and the ground on
which it is based. It is the same sort of difficulty which
arises in regard to insanity, to disposition or temper, to
distances and velocities, and many other subjects, where a
witness is only required to show his means of information,
and then state his conclusions or belief based on those
means. If six witnesses are merely allowed to state that
a man's reputation is bad, and as many say it is good,
without being questioned further, the jury cannot be said
to know much about it. Nor would any cross-examination
be worth much unless it aided them in finding out just
how far each witness regarded it as tainted.

So far as the reports show, the American decisions,
instead of shaking the English doctrine, are very decidedly
in favor of it, and have so held upon repeated and careful
consideration, and we have not been referred to, nor have
we found any considerable conflict.—See in New York,
*People v. Mather, 4 Wend. R., 229* (which was the view of
*Judge Oakley,* no opinion being given by his associate);
*People v. Rector, 19 Wend., 569; People v. Davis, 21 Wend.,
309;* in New Hampshire, *Titus v. Ash, 4 Foster, 319;* in
Pennsylvania, *Bogle's Exrs. v. Kreitzer, 46 Pa. St., 465;
Lyman v. Philadelphia, 56 Pa. St., 488;* in Maryland,
*Knight v. House, 29 Md., 194;* in California, *Stevens v.
Irwin, 12 Cal., 306; People v. Tyler, 35 Cal., 553;* in
Illinois, *Eason v. Chapman, 21 Ill., 33;* in Wisconsin,
*Wilson v. State, 3 Wis., 798;* in Georgia, *Stokes v. State,
18 Ga., 17; Taylor v. Smith, 16 Ga., 7;* in Tennessee,
*Ford v. Ford, 7 Humph., 92;* in Alabama, *McCutchen v.
McCutchen, 9 Port., 650;* in Kentucky, *Mobley, v. Hamit,
1 A. K. Marsh., 590;* also in Judge McLean's Circuit, in
*U. S. v. Van Sickle, 2 McLean, 219.*

Mr. Greenleaf himself intimates that it might be a

proper inquiry on *cross-examination*. We think the inquiry proper, when properly confined and guarded, and not left to depend on any basis but the reputation for truth and veracity. And we also think that the cross-examination on impeaching or sustaining testimony should be allowed to be full and searching.

Where an impeached witness has changed his domicile, there appears to be no objection to showing his reputation in both places within a reasonable limit of time. But, as the only object is to know whether he is to be believed at the time when he testifies, a witness knowing his reputation then, should state that knowledge, although he may also be authorized in addition to show what his reputation had been elsewhere before.

The court should not have permitted the jury to consider any counts except those that charged all the defendants, or any except those which related to the burning with intent to defraud the insurers. No others specified any offense of which all could possibly have been guilty, and upon the rest there should have been a discontinuance or acquittal.

The testimony of Fuller, as an accomplice, was properly left to the jury to believe or not, whether standing alone or corroborated. It was for them to determine to what extent they could credit him, and all of the circumstances of his employment and conduct were proper to be considered as affecting his credit, and they should have been so instructed. But they could not be directed what force to give to these matters. That was their own province. While a jury cannot be compelled to disregard all the testimony of a witness who has wilfully falsified, yet they may do so if they do not trust it. In such a case they know the witness is not restrained by his oath, and they need not pay any respect to his statements beyond what they actually consider them to deserve. The fact that his evidence is more or less corroborated does not in such a case lead to any necessary inference that all the facts he has sworn to

are true. The jury will determine for themselves how far they can trust it, and should not have been directed that there was any condition on which they were forbidden to reject such testimony, if they did not believe it.

The circuit court was asked, but refused, to give the following instruction: "This is a criminal trial on an information for felony, and all the questions of law and fact in the case are exclusively for the jury, and the jury are paramount judges, both of the law and the facts." The court held they were judges of law and fact under some restrictions and conditions, but not in the absolute way indicated.

The precise definition of the rights of a jury in criminal cases is easier understood than expressed. Their decision upon the guilt or innocence of a prisoner can never be directly reviewed, and upon an acquittal there can be no new trial. But if they have the legal authority claimed in the request, their verdict of guilty would be of the same force as their acquittal. In this country, for a long time past, exceptions have been usually allowed to the rulings of the court on the trial, and if those rulings are erroneous, the conviction will be set aside. But this can only be upon the idea that the jury are expected to follow the charges given; and it is as contrary to the law, as usually administered, to refuse to give a proper charge, as to give an improper one. And if a judge were to decline to give any charge,—as he might, if it is of no importance,—it has been assumed that he would violate his duty.

The law does not favor unnecessary intrusions by one functionary upon ground of others. But the charge of a judge in criminal cases is one of the ancient and traditionary incidents of a trial, which must have been introduced for some purpose, and must have some value. It is certain that there is a great body of authority holding it to be meant for the guidance and instruction of the jury, and entitled to their respect. It is true that juries in criminal cases cannot properly find a conviction against their con-

sciences.    It is also true that they cannot be questioned
or held responsible upon their verdict, nor called on to ex-
plain its reasons.    Whether those reasons are based on a
doubt or disbelief of evidence, or on a rejection of the
exposition of law given by the court, they are equally beyond
review.    At common law a conviction was as final as an
acquittal, and could only be relieved by a pardon.    And
it is very well understood that this immunity from censure
or review is necessary to liberty.    A jury cannot be com-
pelled, in dealing with crimes, to seperate the facts from
the law.    The right to give a general verdict is essential
to the integrity of the system, and all attempts to deprive
juries in criminal cases of that power have been opposed
as destructive of the system.    And experience has shown
that special verdicts in such cases have not been favorable to
justice.    We need not hesitate to determine that it is within
the *power* of juries to act upon their own view of the law.
But it does not follow from this that the law does not
assume that they will respect the instructions of the court.

The power of juries in criminal and civil cases is the
same in kind, though different in degree.    The practice of
disregarding or relieving against wrong verdicts in civil
cases is one largely of modern growth.    In early times
verdicts were substantially conclusive.    In modern times,
though they may be set aside, they cannot be reviewed or
altered.    And setting aside verdicts as against law, is a
matter of discretion and not of right.    An appellate court
can only review the action of the judge, not that of the
jury.    And this, too, is not by virtue of the old law, but
by force of statutes, which, though ancient, are yet later in
origin than jury trials.    The jury system is generally
regarded as deriving one of its chief advantages from hav-
ing the law applied to the facts by persons having no
permanent offices as magistrates, and who are not likely to
get into the habit of disregarding any circumstances of
fact; or of forcing cases into rigid forms and arbitrary
classes.    It is especially important, where guilt depends on

a wrong intent, to give full weight to every circumstance that can possibly affect it; and professional persons are under a constant temptation to make the law symmetrical by disregarding small things. But it is necessary, for public and private safety, that the law shall be known and certain, and shall not depend on each jury that tries a cause. And the interpretation of the law can have no permanency or uniformity, and cannot become generally known, except through the action of courts.

It may be fairly regarded as one of the best features of the jury system, that the law, though interpreted by professional interpreters, can only be applied to facts through the understandings of ordinary men of average capacity, and usually including in their number some of very simple minds. By this process it is divested of all that would not be readily comprehended by all men. In this way over-nicety and technicality become less dangerous, if not absolutely harmless; and an apparent deviation in the verdict from the rules laid down, is often no departure from the rules as supposed to be laid down.

But if the court is to have no voice in laying down these rules, it is obvious that there can be no security whatever, either that the innocent may not be condemned, or that society will have any defense against the guilty. A jury may disregard a statute just as freely as any other rule. A fair trial in time of excitement would be almost impossible. All the mischief of *ex post facto* laws would be done by tribunals and authorities wholly irresponsible, and there would be no method of enforcing with effect many of our most important constitutional and legal safeguards against injustice. Parties charged with crime need the protection of the law against unjust convictions, quite as often as the public needs it against groundless acquittals. Neither can be safe without having the rules of law defined and preserved, and beyond the mere discretion of any one. We must construe the jury system, like all other parts of our legal fabric, in the light of history and usage. It came

into this country as a part of our common law, and it has been fixed by our constitutions as a known and regular common-law institution.    Like many of our best heritages from that source, we know what it is, better than how it was devised, or (which is more probable) came into use without devising.    We must look to the use as evidence of the law.    And looking to that, we find that the judge has always assumed to give the jury instructions upon the law.    We find, further, that while there have been severe complaints and stern measures to secure them from his control on the facts, there has never been any attempt to abolish the practice of charging on the law.    All the improvements in mitigation of the old system have gone upon the ground that the jury were expected to follow the instructions of the court.    The introduction of reserved cases, and criminal exceptions would be little short of an absurdity on any other theory.    If there were any grounds of complaint, it would not be for wrong instructions, but for giving any charge at all.    There is much difficulty in dealing with arguments which assume to qualify a system, and yet are not consistent with its uniform history.    A jury system without a presiding judge who is something more than a puppet, is not the jury system which we have inherited.

It would not be profitable to collate or discuss the authorities at length.    They differ in terms more than in substantial results.    If the charge is proper, it can only be so because it is to be respected.    If juries disregard it, they may be free from personal risk, and in cases of acquittal their verdict is conclusive.    But the power to do wrong with impunity does not make wrong right.    The same thing cannot be lawful and unlawful when done by different persons.

We understand the uniform practice, and the decided weight of opinion, to require that the judge give his views of the law to the jury as authority, and not as a matter to be submitted to their review.    And while we recognize the

power of the jury to give wrong verdicts, or to disregard the law, we are nevertheless warranted by usage and authority in holding that such conduct would be an abuse of their discretion, which could only be palliated by such tyrannical and perverse instructions as their good sense should teach them could not possibly be true or just.

This question was presented many years ago to the then supreme court, but for some reason the decision, if made, has not been reported, and is not found.—*People v. Supple, Jan'y., 1853.*

There is undoubtedly some difference between civil and criminal cases in regard to legal presumptions, which will prevent a judge from instructing a jury in the same way as to their weight. This was somewhat discussed in the case of *Maher v. People, 10 Mich. R., 212.* It is very well remarked by a modern writer on evidence, that " artificial presumptions can never be safely established as means of proof in a criminal case. To convict an innocent man is an act of positive injustice, which, according to one of the best and most humane principles of our law, cannot be expiated by the conviction of an hundred criminals who might otherwise have escaped.—*2 Hale, 289.* From such presumptions the common law is justly most abhorrent; and happily our statute-book has not been disgraced by many violations of the humane principles of the common law in this respect."—*Stark. Ev., 743, note f, ed. of 1869.* There is no conclusion or presumption of fact which is not entirely within the disposal of the jury, as it is also entirely for them to determine what portion of testimony to believe or disbelieve; and "it is the conscience of the jury that must pronounce the prisoner guilty or not guilty."—*2 Hale, 313.* But while the rules of criminal law narrow the functions of the judge, they do not abrogate those functions.

Some errors are alleged concerning the dealings of the court with questions of fact. The jury were very fully directed that they must decide upon the facts for themselves, and we do not discover any instructions to the contrary of such a na-

29 MICH.—25.

ture as to call for further comment.    The particular errors of this kind mentioned on the argument do not appear material, or in any way calculated to mislead, and need not be referred to, unless upon the question of intent.    It is possible the language used in that regard may have gone too far, but we do not deem it necessary to discuss it, as the judgment is reversed on other grounds, and it is not likely. that such a question will arise again on a new. trial.

Neither are we disposed to discuss the question concerning the precise limits of a reasonable doubt.    The jury were told they could not convict without being satisfied to a moral certainty, and that defendant was entitled to the. presumption of innocence till every branch of the case should be established against him by evidence.    They were also told that if they found a single material fact inconsistent with his guilt they could not convict.    It is very possible that the definition by the court of a reasonable doubt, as being such a one as would prevent the jurors from acting in their most important concerns, would, if standing alone, have been of questionable sufficiency; yet, whether correct or not, it could certainly have done no harm with the aid of the other instructions given.

But we do not think that juries can derive any help from attempts by numerous and complicated requests to explain what would be very much plainer without them. If a jury cannot understand their duty when told they must not convict when they have a reasonable doubt of the prisoner's guilt, or of any fact essential to prove it, they can very seldom get any help from such subtleties as require a trained mind to distinguish.    Jurors are presumed to have common sense, and to understand common English.    But they are not presumed to have professional, or any high degree of technical or linguistic, training.    The majority of the special requests in this case, on both sides, might have been omitted with advantage; and if the jury came to a wrong conclusion,—on which we have no right to speculate,—we do not conceive that any course that might have

been taken in regard to most of the questions propounded, would have relieved them from their difficulties.

For the reasons we have given the judgment must be reversed and a new trial granted, and the respondent must be remanded into the custody of the proper sheriff, to be held in custody until bailed or otherwise dealt with according to law.

COOLEY, J., and GRAVES, CH. J., concurred.

CHRISTIANCY, J., did not sit in this case.