[No. 14247. Department One. January 30, 1918.]

THE STATE OF WASHINGTON, *Respondent*, v. R. L. HOOKER, *Appellant*.[1]

CRIMINAL LAW—APPEAL—RECORD—STATEMENT OF FACTS. An affidavit in support of an objection that sufficient time had not been allowed accused to prepare his defense cannot be considered on appeal when not brought up by statement of facts or bill of exceptions.

SAME—TRIAL—CONTINUANCE. A continuance in a criminal case in order to prepare for trial is properly denied, where an amended information merely changed the name of the person defrauded and the accused failed to show that a different defense could have been presented if the trial had been delayed.

WITNESSES — IMPEACHING — REPUTATION. After impeaching witnesses have testified that they know the reputation of the other witness for truth and veracity in the community in which he lives, and that it is bad, they may testify whether from their knowledge of that reputation they would believe him on oath.

SAME — IMPEACHING — COMPETENCY. The competency of an impeaching witness who testified as to the reputation of the other witness for truth and veracity in the vicinity in which he resides and does business, is not affected by the fact that he never heard such reputation discussed in the building in which the other witness did business.

SAME. Lack of knowledge of an impeaching witness shown upon cross-examination, goes to the credibility and not to the competency of the witness.

FALSE PRETENSES—EVIDENCE—SUFFICIENCY. A conviction of obtaining money by false pretenses is sustained by evidence that accused induced a credulous woman to make a loan to a third person by falsely representing that he was wealthy and on the security of

[1]Reported in 170 Pac. 374.

ten acres represented to be of the value of $1,000, when accused knew it was practically valueless; and it is immaterial that the money was turned over to the third party or that other independent charges of fraud were not proven.

Appeal from a judgment of the superior court for Spokane county, Huneke, J., entered January 11, 1917, upon a trial and conviction of larceny. Affirmed.

*Mulligan & Bardsley*, for appellant.

*John B. White* and *William C. Meyer*, for respondent.

ELLIS, C. J.—Defendant, R. L. Hooker, was tried separately upon an information charging him and one Pete Stalberge with the crime of larceny under the provisions of Rem. Code, § 2601, subdivision 2. The first count charged the commission of the crime by color or aid of a false instrument or order. No evidence was introduced in support of this count. The second count charged the commission of the crime by false representations and pretenses. Though extremely inartificially drawn, being overladen with unnecessary verbiage and other unsustained charges, it sufficiently alleged that the defendant, Hooker, obtained from one Olga Sebo, as a loan to and upon a promissory note and deed of security made by Stalberge, the sum of $175 in money, upon false and fraudulent representations and pretenses that Stalberge was a farmer, that he was wealthy, that he owned a great deal of property, that he was a perfectly safe man to make a loan to, and that the real estate conveyed by the deed as security was worth $1,000. The sufficiency of the information was in no manner questioned in the court below.

At the trial, evidence was introduced by the state tending to establish the following facts: Hooker was engaged in the real estate and loan business in the city of Spokane. Complaining witness, Olga Sebo, bookkeeper for an undertaker's establishment, desiring to invest her savings in a loan, visited Hooker's place of business for that purpose. Hooker told

her, in substance, that Stalberge wanted a loan of $175; that he was a very upright, very wealthy young Norwegian farmer, who owned a great deal of property, and would give as security ten acres of land in Spokane county north of the city; that the land was worth $1,000, and that Stalberge was "a perfectly upright man to make a loan to." He claimed to have made other loans to the man Stalberge and, exhibiting a book purporting to contain a record of such loans, said: "You can see that Mr. Stalberge is a perfectly upright man and has taken care of these loans that I have transacted for him." She did not know Stalberge, and Hooker did not advise her where he could be found. A few days later she again called at Hooker's office accompanied by her brother, who testified that Hooker made substantially the same representations to them at that time. Relying upon these representations, Miss Sebo finally consented to make the loan. She testified that Hooker offered her a bonus of $15 in addition to the interest. Hooker testified that she demanded a bonus of $25 and that he finally agreed to allow her $15. At any rate, the note was drawn for $190. At Miss Sebo's request, it ran to Anna N. Sebo, her mother. It was agreed that Miss Sebo should meet Hooker and Stalberge and close the loan at the Scandinavian-American Bank, in which bank was to be deposited in escrow as security a deed of the ten acres from Stalberge to Miss Sebo and a certificate of title to the land executed by an abstract company. At the appointed time, Hooker appeared at the bank, but without Stalberge. Miss Sebo paid the $175 to Hooker, and the papers were deposited in the bank to remain in escrow till July 4, 1915, when the note was to become due. Hooker claimed that he subsequently turned over to Stalberge $165, retaining $10 for his own commission. During these transactions neither Miss Sebo nor her brother ever met Stalberge, and it fairly appears that Hooker knew this and knew that she was acting upon his own representations throughout.

In July, 1915, the loan becoming due and remaining unpaid, Miss Sebo, not knowing where to find Stalberge, repeatedly applied to defendant to procure the money for her, but was continually put off with the statement that he could not find, or had been unable to see, Stalberge. Once he agreed to have Stalberge come to the undertaker's office at a certain time. Defendant appeared, but Stalberge did not. Finally, through another source, Miss Sebo located Stalberge and made an arrangement to meet him and Hooker at Hooker's office. At the appointed time she, her brother-in-law and her employer went to Hooker's office, but neither Hooker nor Stalberge appeared. The party then went to Hooker's house and, after a heated interview, it was arranged by telephone with Stalberge to meet them at Hooker's office that evening at six o'clock. When they kept that appointment Hooker appeared, but Stalberge did not. Hooker, pleading another engagement, remained but a short time, advised Miss Sebo to bring suit against Stalberge and file a *lis pendens* to tie up his property, stating that he considered himself morally responsible for the debt and would pay it if she could not collect it from Stalberge. Miss Sebo testified that meanwhile she had made investigation and found that the ten acres had little value, and that she was unable to find that Stalberge had ever been a farmer or owned any property free from incumbrance. There was no evidence that Stalberge ever owned any other property, except a statement of Hooker that Stalberge had applied to him for a loan on a piece of land in Stevens county near the British Columbia line. In April, 1916, Miss Sebo withdrew the deed and certificate of title from escrow. She visited the ten acres in September, 1916, and found it covered with scrub timber and that it was of little value. There was much evidence showing that the land was not worth more than $7 to $10 an acre. There was no evidence to the contrary. Defendant denied that he represented that Stalberge was very wealthy, but

admitted that he stated that Stalberge owned other property. He did not deny that he represented that the ten acres was worth $1,000, but asserted that this was a mere expression of his opinion. It appeared, however, that, at different times, he had used this same land in securing several other loans, and hence must have known its real character.

In July, 1916, a preliminary hearing was had before a justice of the peace and defendant was bound over to appear before the superior court. On August 10, 1916, an information was filed in that court the same as that upon which he was tried, except that the name of the person defrauded was stated as Anna N. Sebo, instead of Olga Sebo. On November 9, 1916, by leave of court, the original information was withdrawn and the new one filed. The case was set for trial on November 14, 1916. Before the jury was impaneled, defendant objected to being tried on that day, mainly on the ground that he had not been given sufficient time to prepare his defense. The objections were overruled. The jury returned a verdict of guilty. Defendant moved for a new trial, which motion was overruled. From the order denying a new trial and from the judgment upon the verdict, defendant appeals.

There are several assignments of error, but we shall consider only those which appellant has seen fit to discuss in his brief.

I. It is first claimed that the court erred in overruling defendant's objection to proceeding with the trial on November 14, 1916. In support of this objection, it appears that an affidavit was filed, but inasmuch as this affidavit is not made a part of the statement of facts, we cannot consider it. *Hayworth v. McDonald*, 67 Wash. 496, 121 Pac. 984; *Congdon v. Aumiller*, 79 Wash. 616, 140 Pac. 912. There is nothing in the record before us from which prejudice can be inferred. A preliminary hearing was had on

June 6, 1916, and the first information was filed August 10, 1916. These things fully advised appellant of the nature of the charge against him, and there is no showing whatever that, had the trial been delayed, any other or different defense than that made would have been, or could have been, presented. We find no error in the overruling of appellant's objections.

II. Appellant had testified in his own defense. Certain impeaching witnesses who had testified that they knew him, knew his reputation for truth and veracity in the community where he lived and did business, and that it was very bad, were permitted further to testify in substance that, from their knowledge of that reputation, they would not believe him on oath. This is assigned as error. In support of his position, appellant cites two decisions of this court: *State v. Coates*, 22 Wash. 601, 61 Pac. 726, and *State v. Miles*, 15 Wash. 534, 46 Pac. 1047. The *Coates* case is not applicable. Though the admittedly proper question as to whether the impeaching witness knew the reputation of the witness whose testimony was there assailed, for truth and veracity in the community in which he lived, had been answered in the affirmative, and the witness had stated that it was bad, the final question as to whether the witness would believe him on oath was not confined to a knowledge or opinion based upon that reputation. By the great weight of modern authority, the question as to personal belief must be based upon knowledge acquired from reputation, and not upon personal dealings or personal acquaintance of the impeaching witness with the witness assailed. *Doner v. People*, 92 Ill. App. 43; *State v. Polhemus*, 65 N. J. L. 387, 47 Atl. 470; *Spies v. People*, 122 Ill. 1, 12 N. E. 865, 17 N. E. 898, 3 Am. St. 320. The case of *State v. Miles*, in so far as it can be regarded as deciding the question, is apposite. In that case, however, the judgment of conviction was reversed for another reason. Touching the question here involved the court, without discussion, said:

"We think the weight of authority is now against permitting witnesses to testify to their opinions in this respect, and the objection was properly sustained."

This court has never held that permitting the question of personal belief on oath founded upon knowledge of reputation alone to be answered would be ground sufficient for a reversal.

A thorough examination of the text books and court decisions convinces us that the statement that the weight of authority is against permitting the question as it arose in the *Miles* case is not accurate. Professor Jones expresses the personal view that the opinion of the impeaching witness based upon reputation for truth and veracity of the witness whose character for truth is assailed "creates an irrelevant piece of testimony, though possibly an utterly innocuous one," but adds:

"Although, as we have seen, the propriety of such questions has been doubted, yet the *great weight of authority sustains the practice.* By the great weight of authority, when the opinion of the witness is thus called for, it is to be based upon his knowledge of the reputation of the other witness and not upon his individual opinion of his real qualities or character." 5 Jones, Blue Book of Evidence, p. 270, § 862.

Professor Wigmore, with his usual thoroughness and discrimination, demonstrates, as we think, conclusively, both historically and by copious quotation from judicial utterance, that, at common law, evidence of reputation was never recognized as the fundamental source of proof, either of general character or of specific traits, and that the traditional impeaching question was "Would you believe the person on oath?" He makes it plain that the modern notion that reputation alone is the admissible source of proof grew out of a misapprehension of certain law writers, notably Swift and Greenleaf, as to the real purport of certain decisions. The effort to reconcile this mistaken notion with the traditional form of impeaching question of the English common law has led the American courts into much confusion. A few of our

courts have taken the radical position, devoid of historical support, that reputation is the sole source of proof, and have excluded the question as to personal belief on oath. Among some six courts so holding, Wigmore classes the state of Washington. (See 5 Wigmore, Evidence, note 6, p. 2638.) In a few states the earlier decisions adhered to the common law rule making the sole source of proof the personal belief of the impeaching witness. Still other courts have allowed the impeaching witness to state whether he knows the character or reputation of the person and then to answer the question, "Knowing that character or reputation, would you believe him on oath?" This, as Wigmore points out, evades the issue, since the witness is not required to say whether the final answer is based upon his personal experience or his knowledge of the reputation. A large number of courts have adopted the only rational course other than that of taking one or the other horn of the dilemma. They require the impeaching witness to answer the questions as to general reputation or general reputation for veracity, and if the witness says he knows that reputation, and that it is bad, they then permit the question, "From such knowledge, would you believe him on oath?" For a full development of this subject see 3 Wigmore on Evidence, §§ 1982, 1984, 1985. He concludes his discussion as follows:

"The Anglo-American rules of evidence have occasionally taken some curious twistings in the course of their development; but they have never done anything so curious in the way of shutting out evidential light as when they decided to exclude the person who knows as much as humanly can be known about the character of another, and have still admitted the second-hand, irresponsible product of multiplied guesses and gossip which we term 'reputation'." 3 Wigmore, Evidence, page 2644, § 1986.

Much can be said in favor of the soundness of these observations. But the rule adopting reputation for truth and veracity as the source of proof and as the sole basis for the

final question as to belief on oath has become so firmly established by the great weight of American authority that it cannot be ignored. We are convinced, however, that the great weight of American authority, whether measured by numbers, historical accuracy or reason, sustains the view that, after the impeaching witness has testified that he knows the reputation of the other witness for truth and veracity in the community in which he lives, and that it is bad, there is no error in permitting the further question, "From your knowledge of that reputation, would you believe him on oath?"

In *Hamilton v. People*, 29 Mich. 173, the supreme court of Michigan, speaking through Justice Campbell, a jurist whose carefulness and ability no one will question, points out Greenleaf's mistake and cogently answers every argument which can be advanced against the admission of the question as to personal belief on oath founded upon knowledge of reputation for truth and veracity, as follows:

"The purpose of any inquiry into the character of a witness is to enable the jury to determine whether he is to be believed on oath. Evidence of his reputation would be irrelevant for any other purpose. And a reputation which would not affect a witness so far as to touch his credibility under oath, could have no proper influence. The English text-books and authorities have always, and without exception, required the testimony to be given directly on this issue. The questions put to the impeaching and supporting witnesses relate, *first*, to their knowledge of the reputation for truth and veracity of the assailed witness; and, *second*, whether from that reputation they would believe him under oath. The only controversy has been whether or no the grounds of belief must rest upon and be confined to a knowledge of reputation for veracity only. But confined to that, the authorities are harmonious. 1 Starkie's Ev., 237 *et seq.*; 2 Phil. Ev. (Edwards' Ed.) 955, 958. A very recent decision is found in *Queen v. Brown & Hedley*, L. R., 1 C. C. R., 70.

"The reason given is that, unless the impeaching witness is held to showing the extent to which an evil reputation has affected a person's credit, the jury cannot accurately tell what the witness means to express by stating that such repu-

tation is good or bad, and can have no guide in weighing his testimony. And since it has become settled that they are not bound to disregard a witness entirely, even if he falsifies in some matters, it becomes still more important to know the extent to which the opinion in his neighborhood has touched him. It has also been commonly observed that impeaching questions as to character are often misunderstood, and witnesses, in spite of caution, base their answer on bad character generally, which may or may not be of such a nature as to impair confidence in testimony. When the question of credit under oath is distinctly presented, the answers will be more cautious.

"Until Mr. Greenleaf allowed a statement to creep into his work on evidence to the effect that the American authorities disfavored the English rule, it was never very seriously questioned. See 1 Greenl. Ev., § 461. It is a little remarkable that of the cases referred to to sustain this idea, not one contained a decision upon the question, and only one contained more than a passing *dictum* not in any way called for. *Phillips v. Kingfield*, 1 Appleton's (Me.) R., 375. The authorities referred to in that case contained no such decision, and the court, after reasoning out the matter somewhat carefully, declared the question was not presented by the record for decision. The American editors of Phillips and Starkie do not appear to have discovered any such conflict, and do not allude to it. They do, however, as many decisions do, refer to the kind of reputation which should be shown, and whether of veracity or of other qualities. In *Webber v. Hanke*, 4 Mich. R., 198, no question came up on the record except as to the species of reputation, and the neighborhood and time of its existence; and what was said further was not in the case, and cannot properly dispose of the matter. The objection alleged to such an answer by a witness is, that it enables the witness to substitute his opinion for that of the jury. But this is a fallacious objection. The jury, if they do not act from personal knowledge, cannot understand the matter at all without knowing the witness' opinion, and the ground on which it is based. It is the same sort of difficulty which arises in regard to insanity, to disposition or temper, to distances and velocities, and many other subjects, where a witness is only required to show his means of information, and then state his conclusions or be-

lief based on those means. If six witnesses are merely allowed to state that a man's reputation is bad, and as many say it is good, without being questioned further, the jury cannot be said to know much about it. Nor would any cross-examination be worth much unless it aided them in finding out just how far each witness regarded it as tainted.

"So far as the reports show, the American decisions, instead of shaking the English doctrine, are very decidedly in favor of it, and have so held upon repeated and careful consideration, and we have not been referred to, nor have we found any considerable conflict. See in New York, *People v. Mather*, 4 Wend. R., 229 (which was the view of Judge Oakley, no opinion being given by his associate); *People v. Rector*, 19 Wend., 569; *People v. Davis*, 21 Wend., 309; in New Hampshire, *Titus v. Ash*, 4 Foster, 319; in Pennsylvania, *Bogle's Exrs. v. Kreitzer*, 46 Pa. St., 465; *Lyman v. Philadelphia*, 56 Pa. St., 488; in Maryland, *Knight v. House*, 29 Md., 194; in California, *Stevens v. Irwin*, 12 Cal., 306; *People v. Tyler*, 35 Cal., 553; in Illinois, *Eason v. Chapman*, 21 Ill., 33; in Wisconsin, *Wilson v. State*, 3 Wis., 798; in Georgia, *Stokes v. State*, 18 Ga., 17; *Taylor v. Smith*, 16 Ga., 7; in Tennessee, *Ford v. Ford*, 7 Humph., 92; in Alabama, *McCutchen v. McCutchen*, 9 Port., 650; in Kentucky, *Mobley v. Hamit*, 1 A. K. Marsh., 590; also in Judge McLean's circuit, in *U. S. v. Van Sickle*, 2 McLean, 219.

"Mr. Greenleaf himself intimates that it might be a proper inquiry on cross-examination. We think the inquiry proper, when properly confined and guarded, and not left to depend on any basis but the reputation for truth and veracity. And we also think that the cross-examination on impeaching or sustaining testimony should be allowed to be full and searching."

It is true in that case the question arose on cross-examination, but the implication that the same rule would apply to the direct examination will be noted, and in the later case of *Keator v. People*, 32 Mich. 484, the same eminent jurist says:

"In the case of *Hamilton v. People* [29 Mich. 173], we had occasion to discuss the question whether it was proper to allow an inquiry if the impeaching witness from the evil

reputation of the impeached witness would believe him under oath. We there held it proper on cross-examination; but we think the same reasons render it proper also on direct examination, as it is as certainly as proper to lay before the jury all that directly bears on the impeachment without cross-examination as with it. We do not think it necessary to repeat the grounds which were there discussed, and which, in our opinion, vindicate the rule of the English and of many American cases against what we deem an incorrect doctrine of Mr. Greenleaf to the contrary."

The following cases, taken almost at random from a multitude which might be cited, sustain and exemplify the rule stated by Judge Campbell: *State v. Johnson,* 40 Kan. 266, 19 Pac. 749; *Cole v. State,* 59 Ark. 50, 26 S. W. 377; *Crawford v. State,* 112 Ala. 1, 21 South. 214; *Spies v. People* and *Doner v. People, supra; Nelson v. State,* 32 Fla. 244, 13 South. 361; *State v. Christian,* 44 La. Ann. 950, 11 South. 589; *Taylor v. State,* 5 Ga. App. 237, 62 S. E. 1048; *Bogle's Ex'rs v. Kreitzer,* 46 Pa. St. 465; *Duffy v. Radke,* 138 Wis. 38, 119 N. W. 811; *Rudsill v. Slingerland,* 18 Minn. 380; *State v. Howard,* 9 N. H. 485; *State v. Polhemus, supra; Ware v. State,* 36 Tex. Cr. 597, 38 S. W. 198; *State v. Marks,* 16 Utah 204, 51 Pac. 1098; *People v. Ryder,* 151 Mich. 187, 114 N. W. 1021; *Knight v. House,* 29 Md. 194, 96 Am. Dec. 515.

In the case here, the impeaching witnesses had already testified that appellant's reputation for truth and veracity was bad, or very bad. Their further answers, based upon their knowledge of that reputation, to the effect that it was so bad that they would not believe him on oath, was obviously but another way of saying the same thing. We hold that permitting these answers presents no sufficient ground for reversal.

III. One of the impeaching witnesses had testified in substance that she knew appellant's reputation for truth and veracity "in the vicinity in which he does business and resides." On cross-examination it appeared that she had

never talked touching his reputation with any one in the Peyton building, in which was appellant's office. Appellant thereupon moved to strike her testimony. The denial of this motion is urged as error. The assignment is without merit, and for two reasons. In the first place, the conception of a reputation as a thing confined within the four walls of an office building is entirely too narrow. In the second place, any lack of knowledge of the reputation assailed shown upon cross-examination went to the credibility or weight of the impeaching testimony rather than to its competency. *State v. Meadows*, 18 W. Va. 658.

IV. Finally, it is contended that the court erred in refusing to direct a verdict of not guilty. It is urged that the evidence was wholly insufficient to sustain the verdict rendered. The evidence introduced by the state, the purport of which appears in our statement of the case, seems to us amply sufficient to sustain the charge of procuring money by false and fraudulent representations and pretenses. Its credibility was for the jury. The making of some of these representations he did not deny, others he merely qualified. The assertion that these representations were mere expressions of opinion will not avail. It can hardly be doubted that he knew that Miss Sebo did not so regard them—at least the jury was justified in so finding. From the evidence the jury was also justified in finding that they were false and that he knew they were false. Undoubtedly Miss Sebo was culpably confiding and credulous, but hardly more so than the yokel who succumbs to the lure of the bunco game denounced by the same statute. It was to protect these, and such as these, that the statute was passed. Appellant's claim that he turned $165 of the money over to Stalberge, even if believed by the jury, was no defense. The money was procured by appellant through his own representations. Nor is it material on the record as here presented that other independent charges of fraud made in the information were not

established.  No demurrer was interposed to the informa-
tion, nor was it moved against for duplicity or for any other
reason.  We find nothing in the record warranting a re-
versal.

The judgment is affirmed.

WEBSTER, FULLERTON, MAIN, and PARKER, JJ., concur.